ATTORNEYS FOR APPELLANT
Ruth Ann Johnson
Marion County Public Defender

Andrew J. Borland
Meggan E. Smith
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Andrew A. Kobe
Jodi K. Stein
Deputy Attorneys General
Indianapolis, Indiana



FILED

Aug 10 2017, 12:49 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# In the
# Indiana Supreme Court

No. 02S00-1604-LW-185

BOB LEONARD,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Allen Superior Court, No. 02D05-1502-MR-1
The Honorable Frances C. Gull, Judge

On Direct Appeal

**August 10, 2017**

**Massa, Justice.**

Bob Leonard was convicted of two counts of knowing murder, one count of conspiracy to commit arson, and dozens of counts of arson for his role in the 2012 Richmond Hill home explosion. The trial court sentenced him to Life Without Parole on each of the murder convictions, and consecutive terms of years for conspiracy and arson. In this direct appeal, Leonard raises several issues for our review, which we reorder and consolidate as follows: (1) whether there was sufficient evidence to support the murder convictions; (2) whether there was sufficient evidence

to support a statutory aggravator; (3) whether the trial court abused its discretion by refusing Leonard's lesser included jury instruction; and (4) whether Indiana's LWOP sentencing statute is unconstitutional. We affirm, finding there was sufficient evidence for the murder convictions and statutory aggravator, the trial court did not abuse its discretion when it refused Leonard's tendered instruction, and Indiana's LWOP sentencing statute is not unconstitutional.

**Facts and Procedural History**

On November 10, 2012, at 11:08 p.m., the Marion County Sheriff's Office received its first 911 call describing confusion, a huge bang, and homes shaking on Indianapolis's southeast side. Over the following minutes and hours, 281 more 911 calls would be placed describing the impact from a home explosion in the Richmond Hill subdivision. Firefighters, located at a nearby station, were among those first to arrive. They observed at least one home "completely flattened" and many others with significant damage, substantial gas-fed fires, debris scattering the streets, and many residents wandering outside their homes, emotional and watching the chaos unfold around them. Tr. at 461. Investigators would later conclude that a natural gas explosion with the force of roughly three tons of TNT, originating from Monserrate Shirley's home at 8349 Fieldfare Way, was to blame for the devastation and total destruction that occurred that night.

Shirley was a nine-year resident of the Richmond Hill neighborhood and lived in her home with her boyfriend, Mark Leonard, her teenaged daughter, and her daughter's cat Snowball. Shirley and Mark first met in November 2011, but their lives quickly melded. Indeed, a month after meeting and two weeks after moving in together, Mark suggested that Shirley increase her home contents insurance from $150,000 to $300,000. Shirley also insured two of Mark's vehicles, a Harley Davidson motorcycle and a Cadillac, both of which he stored in her garage. Then in February 2012, Mark pitched the idea of burning Shirley's house to collect the insurance proceeds. Mark told Shirley about a friend of his, Gary Thompson, who had started a fire in the home of another friend for the same purpose, and the insurance company quickly paid the claim. Although

2

Shirley thought the idea was "crazy," Mark assured her it would "be a small fire, [and she didn't] have to worry about it."  Tr. at 3581–82.

In late October 2012, Mark and Shirley invited Thompson over to Shirley's house and told him they were "ready to do the small fire" so they could "get the insurance money."  Tr. at 3598. That same day, Shirley overheard Mark and Thompson discussing the home's thermostat and fireplace, which could be used to start the fire.  Mark told Shirley they planned to set the fire on Saturday, October 27, 2012.  In preparation, Shirley removed sentimental items that she didn't want destroyed, and Mark placed them in his white van, which Thompson took for safekeeping. Shirley also made overnight arrangements for her teenaged daughter, boarded Snowball at the kennel, and reserved a room at the Hollywood Casino in Lawrenceburg, Indiana for her and Mark to stay in.  Everything was set to go, but on the way to Shirley's house Thompson was pulled over by police, and was unable to set the fire.

Once thwarted, Mark endeavored to try again the next week.  He and Thompson suspected that gas was exiting from the fireplace, so they cut a piece of cardboard to block the gas from escaping.  On the evening of November 1, 2012, Mark's brother, Bob Leonard ("Leonard"), came over to Shirley's house to discuss Leonard's assisting in setting the fire.  Leonard wanted $1,200 upfront for his involvement, but Mark told him he didn't have the money yet.  Instead, he and Mark arranged a deal whereby Leonard would receive $10,000 of the insurance proceeds.  The fire was planned for November 3, 2012, and Shirley made the same arrangements as before:  her teenaged daughter was away, Snowball was kenneled, and she and Mark went to the Hollywood Casino.  Before Shirley and Mark left for the casino, Leonard came over.  Leonard and Mark inspected the thermostat and turned on the gas, and then Leonard left in Mark's white van.

To their dismay, the plan failed again.  When Mark and Shirley returned to Indianapolis the next day, now twice thwarted, Mark called Leonard and asked him to meet.  Leonard arrived in Mark's van, and they arranged to burn the house that evening.  Like before, Shirley made a hotel reservation for that night.  However, Mark also instructed Shirley to call the cooling and heating company to report a thermostat problem, but under no circumstances should she allow them to

come into the home. Ultimately, the house was not set on fire that night, but Mark and Leonard continued their efforts to destroy the home.

Mark and Leonard surmised that earlier attempts to set Shirley's house on fire failed due to the home's large size. In response, Leonard and Mark bought a ceramic heater and replaced the home's digital thermostat with an old-style mercury one that would create a spark, and thus ignite the gas-filled home. When Shirley noticed, she requested that they change it back, which they did; but Mark added he would not quit in his efforts to start a fire, even if it required him to light a cigarette and pour gasoline on the floor. Thereafter, Mark and Leonard used hot glue to seal around the furnace and other areas in the house that might be leaking air, and Thompson came over to ensure the thermostat would start the impending fire. Shirley also noticed two additional gas cans in her garage, which concerned her.

Over the next couple of days, Mark and Leonard's efforts intensified. They went to their local library to research a fire that had occurred in a house similar to Shirley's. The pair also spoke with Leonard's acquaintance, Arthur Kirkpatrick, an employee of Citizens Gas Company. Leonard asked Kirkpatrick about natural gas, how much gas it would take to fill up a house, and what would happen once a house was filled. Kirkpatrick shared that "just like a balloon, once [a house] gets full, it's gonna pop or blow up or something." Tr. at 4326. On November 9, 2012, Shirley once again made arrangements for her daughter, boarded Snowball, and reserved a room at the Hollywood Casino. Before leaving for the casino, Shirley and Mark removed their valuables from Shirley's home, and met with Leonard to give him money to purchase the remaining parts needed to set the fire. Leonard accepted the money, and left in Mark's white van. The next night, while sitting at the Hollywood Casino bar, Shirley received a phone call informing her there had been a huge explosion in her neighborhood and her house was completely gone.

Next door to Shirley's home lived John "Dion" and Jennifer Longworth. As a result of the explosion, their home was reduced to rubble, with John trapped underneath in the home's basement. Although he survived the initial explosion and could communicate with those nearby, as the fire intensified, firefighters were forced to step away, and John was burned to death in the

4

ensuing flames. Jennifer was in an upstairs bedroom, and died quickly from "blast injuries," which result from "a tremendous change in energy that causes [the very dense skull and inner ear bones] to fracture." Tr. at 1604–05. Due to extensive charring to their bodies, both John and Jennifer had to be identified by their dental records.

Ultimately, the State of Indiana brought fifty felony charges against Leonard, including numerous counts of murder, arson, and conspiracy to commit arson. At trial, the State added two additional counts of knowing murder. On those murder charges, the State sought sentences of Life Without Parole, alleging three aggravating circumstances.[1]

Extensive discovery and pre-trial proceedings ensued. After several delays, including a change of venue from Marion County, the guilt phase of Leonard's jury trial began January 19, 2016 and concluded February 24, 2016, generating a twenty–volume transcript and over eighteen hundred exhibits. Following the guilt phase of trial, the jury found Leonard guilty as charged on all counts. That same day, Leonard waived his right to trial by jury for the penalty phase of the LWOP trial. Accordingly, the trial court conducted a hearing before the bench.

The trial court merged the felony murder and the knowing murder counts, and entered convictions on only the murder counts and most of the arson counts. Further, the trial court found "the three aggravating circumstances [had been] prove[d] beyond a reasonable doubt" and that they "outweigh[ed] the absence of mitigating circumstances." App. Vol. II at 80–81. The trial court thus imposed consecutive Life Without Parole sentences for the two murder convictions, and

---

[1] In exchange for her testimony at Leonard's trial, Shirley entered into an agreement with the State in which she pleaded guilty to one count of conspiracy to commit arson as a Class A felony and one count of conspiracy to commit arson as a Class B felony. All remaining charges were dismissed. The agreement called for a sentence of between 20 and 50 years. The record before us does not reveal Shirley's sentence, but public records indicate Shirley was sentenced to 50 years executed in the Department of Correction. See State v. Shirley, 49G03-1212-MR-085548 (Marion Sup. Ct., Crim. Div. 3 Dec. 20, 2016).

further imposed 50 years for all of the arson counts, plus 20 years for conspiracy to be served consecutively to the LWOP sentences. Leonard now appeals, challenging the sufficiency of the evidence for his murder convictions and a statutory aggravator, the trial court's refused reckless homicide instruction, and Indiana's LWOP sentencing statute. Pursuant to Appellate Rule 9(A)(1)(a), this Court has mandatory and exclusive jurisdiction over his appeal. Additional facts are provided as necessary.

## I. Sufficiency of the Evidence

Leonard contends that the evidence showing he knowingly killed the Longworths is insufficient. Specifically, Leonard argues that the evidence failed to show he was aware with a high probability that someone outside of Shirley's home would be killed in light of the unprecedented explosion and steps taken to avoid harm. The State counters that knowledge can be inferred based on using an unrestrained source of gas to detonate the fire, especially when ignited on a weekend night when people are likely to be in their homes only ten feet away. Moreover, the State points to the larger plan that was in place, their intent to completely consume the home in fire, and Leonard's numerous efforts to manipulate the gas fireplace.

When reviewing a challenge to sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility; instead we consider only the evidence and the reasonable inferences supporting the verdict. Suggs v. State, 51 N.E.3d 1190, 1193 (Ind. 2016). We will affirm the conviction if there is probative evidence from which a reasonable jury could have found Leonard guilty beyond a reasonable doubt. Id. Here, the State had the burden to show that Leonard knowingly killed the Longworths beyond a reasonable doubt. A person knowingly kills when they are "aware of a high probability" that their actions may kill. Ind. Code § 35-41-2-2(b) (2008). "Because knowledge is the mental state of the actor, the trier of fact must resort to reasonable inferences of its existence." Young v. State, 761 N.E.2d 387, 389 (Ind. 2002).

The evidence favorable to the judgment shows that Leonard planned to set a fire that would completely consume Shirley's house with the intent to reap $300,000 in insurance money. In order to collect the full amount, Leonard noted that the contents of the house could not be distinguishable. A jury could reasonably infer that Leonard's intent to destroy everything in the home to get the full insurance payout contradicted other testimony regarding their plan to light a small fire.

The record also indicates that Leonard participated in all but one attempt to set Shirley's home on fire. After each attempt, he became more knowledgeable and increased his efforts to set the fire. Investigators determined that the explosion was caused by intentionally removing the fireplace valve so that gas would leak into the house, and setting a timing device to trigger the fire. Moreover, Leonard and others had previously sealed the home so that gas could not escape, gasoline was poured on the floors, and the thermostat had been replaced. These efforts were done with the awareness that once a home is filled with gas, it will "pop or blow up." Tr. at 4326. Thus, the jury could reasonably conclude that Leonard was aware that death was one of the highly probable consequences of their plan. Additionally, Leonard had visited Shirley's home and could readily see that the houses were near to each other, including the Longworths' home which was only ten feet from Shirley's. Leonard programmed the microwave to ignite the fire at 11:00 p.m. on a Saturday night, a time when people were likely to be home. Although the Longworths were in their home, not Shirley's, given the "very close proximity—approximately ten feet," the chances that a fire would impact homes nearby increased, and thus a jury could reasonably find sufficient evidence to support the knowing murder convictions. Mark Leonard v. State, 73 N.E.3d 155, 161–62 (Ind. 2017).

But, knowledge "may [also] be inferred from the use of a deadly weapon in a way likely to cause death." Young, 761 N.E.2d at 389. As we found in Mark Leonard, the mixture of natural gas with oxygen paired with an ignition source "is readily capable of causing serious bodily injury." 73 N.E.3d at 161; see Ind. Code § 35-31.5-2-86(2) (Supp. 2012) (A deadly weapon may be "[a] destructive device, weapon, device, taser . . . or electronic stun weapon . . . , equipment, chemical substance, or other material that in the manner it: (A) is used; (B) could ordinarily be

used; or (C) is intended to be used; is readily capable of causing serious bodily injury."). Leonard was aware of what happens when a home fills with gas and his efforts made certain that the gas would fill the home and not escape so that it would be completely consumed in fire. Thus, the jury could infer that Leonard's actions were consistent with designing an explosion and fire that had a high probability of resulting in death.

In sum, we find the evidence is sufficient to sustain Leonard's two knowing murder convictions.

## II. Aggravating Circumstances

The State sought LWOP based on three aggravating circumstances: (1) Leonard "committed the murder by the unlawful detonation of an explosive with intent to injure a person or damage property," Ind. Code § 35-50-2-9(b)(2) (2008); (2) Leonard "committed another murder, at any time, regardless of whether [Leonard] has been convicted of that other murder," Id. § 35-50-2-9(b)(8); and (3) Leonard "burned [or] mutilated" John Longworth while he was alive, Id. § 35-50-2-9(b)(11). The trial court found the State proved each of the aggravators beyond a reasonable doubt, and further that the aggravating circumstances outweighed the absence of mitigating circumstances.[2]

---

[2] Ordinarily, a jury is required to find that the State has met its burden to prove any aggravating circumstances beyond a reasonable doubt, and further to determine whether any mitigating circumstances outweigh before imposing LWOP. See Ind. Code § 35-50-2-9(d). However, because Leonard waived his right to a jury trial for the LWOP phase of his trial, the trial court was instead tasked with this duty. Id. § 35-50-2-9(g), (l).

On appeal, Leonard challenges only the subsection (b)(11) aggravator, arguing intentionality is required and the State offered insufficient evidence on that point. At trial, the court found:

> John Longworth survived the explosion, but was killed in the subsequent fire. He had to be identified by dental records due to extensive injury from the fire as over 90% of his body was charred and mutilated, with remnants of burned clothing attached. He inhaled a large amount of soot which was found in his lungs, and would have had to have been alive to inhale the soot. He was burned while alive. The Court reached this conclusion based upon the evidence at trial from all the witnesses who attempted to rescue John Longworth, the pathologist's testimony concerning the autopsy she performed and the cause of death, and the 911 call admitted during Phase II of the trial. As the fire which killed John Longworth was a direct result of the explosion at 8349 Fieldfare Way, the Court finds that the State has proven beyond a reasonable doubt the existence of [this aggravating circumstance].

App. Vol. II at 79–80. The State maintains that based on the plain language of subsection (b)(11) all that it was required to show was "that [Leonard] burned John Longworth while Longworth was alive," and it did so beyond a reasonable doubt.[3] Appellee's Br. at 56.

Leonard acknowledges that no cases have analyzed "burned" or "mutilated" in the context of subsection (b)(11); however, he cites to this Court's opinion in <u>Nicholson v. State</u>, 768 N.E.2d

---

[3] Moreover, the State argues that even if the evidence is insufficient, any error is harmless "based on the remaining two valid aggravators and the complete absence of any mitigators." Appellee's Br. at 55. Thus, Leonard would still be subject to LWOP. We agree. <u>See</u> Ind. Code § 35-50-2-9(l) ("Before a sentence may be imposed under this section, . . . the court, . . . must find that: the state has proved beyond a reasonable doubt that *at least one (1) of the aggravating circumstances listed in subsection (b) exists . . .*") (emphasis added); <u>see also</u> App. Vol. II at 80–81 ("Pursuant to I.C. 35-50-2-9(l), the three aggravating circumstances which have been proven beyond a reasonable doubt as charged under I.C. 35-50-2-9(b)(2), I.C. 35-50-2-9(b)(8), and I.C. 35-50-2-9(b)(11) outweigh the absence of mitigating circumstances and [the court] imposes Life Without Parole on [the murder counts], consecutive").

443 (Ind. 2002), which analyzed "torture," also found in subsection (b)(11), in support of his argument that intentionality is required. This is the same argument raised by Mark Leonard in his direct appeal decided only months ago. See Mark Leonard, 73 N.E.3d at 163–65. We rejected that argument there, and for the same reasons we reject it here.[4]

### III. Jury Instruction

Toward the end of trial, Leonard submitted proposed final jury instructions, which included an instruction on reckless homicide. He argued a serious evidentiary dispute existed as to his culpability "given the nature of the events and [] unanticipated result . . .", and as to whether the killings were knowing or merely reckless. Tr. at 4510. While the State agreed that reckless homicide is a lesser included offense of knowing murder, it argued there was no serious evidentiary dispute because Leonard denied involvement completely, and thus failed to argue or present evidence on recklessness.[5] The trial court agreed with the State, concluding that "[b]ased on the evidence that [it] heard and the arguments of counsel . . . [it would] decline to give a reckless homicide instruction as a lesser-included." Tr. at 4515.

On appeal, Leonard argues that the trial court erred because whether he acted recklessly or knowingly were disputed issues from the evidence. The State responds that arguing culpability

---

[4] Alternatively, Leonard argues that without an intent requirement subsection (b)(11) is unconstitutional for failing to narrow the class of persons subject to LWOP. Because Leonard asserts this argument for the first time on appeal, we find it waived. Plank v. Cmty. Hosps. of Ind., Inc., 981 N.E.2d 49, 53 (Ind. 2013) ("Declining to review an issue not properly preserved for review is essentially a cardinal princip[le] of sound judicial administration." (internal quotation omitted)).

[5] At trial, the State distinguished this case from Mark Leonard's. There the State did not oppose a jury instruction on reckless homicide because Mark admitted culpability, but argued the explosion was "just supposed to be a small fire and [] attacked origin and cause vigorously . . ." Tr. at 4511.

does not always raise a serious evidentiary dispute, and the evidence supporting knowing murder was "overwhelming." Appellee's Br. at 45.

To determine whether to instruct a jury on a lesser included offense, the trial court must engage in a three-part analysis. Isom v. State, 31 N.E.3d 469, 485 (Ind. 2015). The first two parts require the trial court to consider whether the lesser included offense is inherently or factually included in the greater offense. Id. If it is, "then the trial court must determine if there is a serious evidentiary dispute regarding the element that distinguishes the lesser offense from the principal charge." Id. Here, the distinguishing element between knowing murder and reckless homicide is culpability. Compare Ind. Code § 35-41-2-2(b) ("A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so.") with Ind. Code § 35-41-2-2(c) ("A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct.").

When considering whether there is a serious evidentiary dispute, the trial court examines the evidence presented by both parties regarding the element(s) distinguishing the greater offense from the lesser one. Young v. State, 699 N.E.2d 252, 255 (Ind. 1998). This involves evaluating the "weight and credibility of [the] evidence," and then determining the "seriousness of any resulting dispute." Fish v. State, 710 N.E.2d 183, 185 (Ind. 1999). Because the trial court found no serious evidentiary dispute existed, we will reverse only if that finding was an abuse of discretion. Young, 699 N.E.2d at 255. In our review, "we accord the trial court considerable deference, view the evidence in a light most favorable to the decision, and determine whether the trial court's decision can be justified in light of the evidence and circumstances of the case." Fish, 710 N.E.2d at 185.

On balance, we do not find the trial court abused its discretion in refusing to give a reckless homicide instruction. Although Leonard denied involvement, he points to evidence that the plan all along was to set a small fire at Shirley's home, and that before each attempt they made sure the home was unoccupied. The State, however, presented evidence outlining the multiple attempts

Leonard took to ensure the house would catch fire, each time upping the ante. Leonard researched, met with a gas company employee and asked what happens when a home fills with gas, manipulated the fireplace, set a timing device, and poured gasoline on the floors. Although not dispositive that Leonard failed to affirmatively assert that he acted only recklessly, it does carry some weight, because at the same time the trial court and jurors were faced with extensive evidence outlining Leonard's deliberate and sophisticated actions supporting knowing murder. While the evidence may not be "entirely free from doubt," viewing it in the light most favorable to the trial court's decision, it is substantial enough to support the trial court's conclusion that no serious evidentiary dispute existed. Heavrin v. State, 675 N.E.2d 1075, 1078 (Ind. 1996). Indeed, the trial court's decision is given "considerable deference" because the court has the best view of the evidence, and here Leonard failed to develop enough specific evidence to indicate to the court that there was a serious dispute. Fish, 710 N.E.2d at 185. Thus, we affirm.

### IV. Constitutionality of Indiana's Life Without Parole Statute

Leonard challenges Indiana's Life Without Parole statutory sentencing scheme as unconstitutional under Hurst v. Florida, 577 U.S. __, 136 S. Ct. 616 (2016). He argues that the statute is unconstitutional because it does not require a *jury* to find aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. This argument is identical to the one raised in Mark Leonard, 73 N.E.3d at 168–169, which we rejected. For the reasons set forth in that opinion, we likewise decline to find Indiana's LWOP statutory scheme unconstitutional.

### Conclusion

For the foregoing reasons, we affirm Leonard's convictions and LWOP sentences.

Rush, C.J., and David, Slaughter, and Goff, JJ., concur.

12