# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 16 2018, 9:15 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy J. O'Connor
O'Connor & Auersch
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Isaac Hicks,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 16, 2018

Court of Appeals Case No.
18A-CR-87

Appeal from the Marion Superior Court

The Honorable Stanley E. Kroh, Magistrate

Trial Court Cause No.
49G03-1606-MR-23007

**Bailey, Judge.**

# Case Summary

Following a jury trial, Isaac Hicks ("Hicks") was convicted of Neglect of a Dependent Resulting in Death, a Level 1 felony.[1] On appeal, Hicks argues that the evidence is insufficient to support his conviction. We affirm.

# Facts and Procedural History

On April 20, 2016, Tamika Culpepper ("Culpepper")—Hicks's girlfriend—gave birth to their son, Z.H. Although Z.H. initially had a jaundice-related health issue, the jaundice resolved and Z.H. was generally healthy by June of 2016.

In early June—when Z.H. was just over six weeks old—Hicks was living with his grandmother ("Grandmother") while Culpepper lived nearby with her mother. Hicks and Culpepper shared parenting responsibilities, and Culpepper would sometimes stay overnight with Hicks and Z.H. at Grandmother's residence. On June 5, 2016, Culpepper went to Grandmother's residence after work for one of these overnight visits. When Culpepper arrived at some point after 10:00 p.m., Z.H. was in his bouncy chair, and was behaving normally. Z.H. later fell asleep in his bassinet. Hicks and Culpepper stayed up a bit later, and then went to sleep with Z.H. nearby.

---

[1] Ind. Code § 35-46-1-4(a)(1), (b)(3).

[4] Overnight, Z.H. woke up twice, and Culpepper got up to feed him both times. Culpepper last fed Z.H. around 5:30 a.m. Later that morning, Grandmother left, and Hicks got up to lock the door behind her. Around 8:05 a.m., Hicks greeted a service technician who arrived to work on the television service. The technician observed Hicks preparing a bottle, and saw Z.H. moving. Culpepper remained asleep during the service call, which was completed around 8:45 a.m.

[5] At 9:52 a.m., Hicks downloaded a document to his cell phone. The document was named "SevereBrainInjury_rev7.pdf." At 10:00 a.m., Hicks called 9-1-1 and reported that Z.H. was not breathing. When Hicks brought Z.H. out to the ambulance, Z.H. was limp. Emergency responders could not find a pulse, and conducted CPR. After Z.H. was in the ambulance, Hicks woke Culpepper and told her that Z.H. was not breathing and in an ambulance. Culpepper rushed outside and rode in the ambulance as responders attempted to resuscitate Z.H.

[6] Meanwhile, law enforcement spoke with Hicks at the residence. Hicks—who was nineteen years old at the time—explained that when he discovered that Z.H. was not breathing, he brought Z.H. to an upstairs bathroom and changed Z.H.'s clothes to see if that would wake him up; when Z.H. would not wake up, he called 9-1-1. Hicks later told a detective that he woke up knowing he needed to change Z.H.'s diaper; Hicks said that he brought Z.H. upstairs, realized Z.H. was not breathing, and called 9-1-1. At some other time, Hicks told Culpepper that he was making breakfast, realized Z.H. needed a diaper change, went to change the diaper, and called 9-1-1 when he realized Z.H. was not breathing.

[7] When Z.H. arrived at the hospital, he had regained a pulse but was not breathing on his own. Z.H. was unconscious, with severe internal injuries, and was so cold that his temperature would not register on the thermometer. Z.H.'s blood had become acidic due to a prolonged lack of oxygen. It was determined that Z.H. had experienced hemorrhaging inside of his retinas, optic nerve, and both hemispheres of his brain. Due to his young age, Z.H.'s skull had not yet fused, and pressure from internal injuries had caused his skull to spread apart. Z.H. had a fresh abrasion on the back of his head, and linear abrasions. Z.H. also had a fractured rib, and fractures at the ends of his right wrist and left tibia. Z.H.'s injuries were consistent with being squeezed and violently shaken.

[8] After eight days in the hospital, Z.H. died from his internal injuries on June 14, 2016. The next day, the State charged Hicks as follows: Count I—Murder, a felony;[2] Count II—Neglect of a Dependent Resulting in Death, a Level 1 felony; and Count III—Battery Resulting in Death to a Person Less Than 14 Years of Age, a Level 2 felony.[3] A jury determined that Hicks was guilty of Neglect of a Dependent Resulting in Death, and not guilty of Murder; the jury could not reach a verdict on the Battery count. The court entered judgment of acquittal on Count I and dismissed Count III. Following a sentencing hearing on Count II, the trial court imposed an executed sentence of twenty-eight years.

---

[2] I.C. § 35-42-1-1.

[3] I.C. § 35-42-2-1(c)(1), (j)(1).

Hicks now appeals.

# Discussion and Decision

When reviewing a challenge to the sufficiency of evidence supporting a conviction, "we neither reweigh the evidence nor judge witness credibility; instead we consider only the evidence and the reasonable inferences supporting the verdict." *Leonard v. State*, 80 N.E.3d 878, 882 (Ind. 2017). We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

Indiana Code Section 35-46-1-4(a) provides, in pertinent part, that "[a] person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally . . . places the dependent in a situation that endangers the dependent's life or health . . . commits neglect of a dependent, a Level 6 felony." The offense is elevated to a Level 1 felony "if it is committed . . . by a person at least eighteen (18) years of age and results in the death of a dependent who is less than fourteen (14) years of age." I.C. § 35-46-1-4(b)(3). Here, the State alleged that Hicks knowingly endangered Z.H. by failing to seek medical attention; the charging information reads as follows:

> On or about June 6, 2016, Isaac Hicks, being at least 18 years of age and having the care of Z.H., a dependent less than 14 years of age, did knowingly place said dependent in a situation that endangered the dependent's life or health, to-wit: did not seek medical attention, which resulted in the death of Z.H.

App. Vol. II at 30.

[12] Hicks does not dispute the sufficiency of evidence as to the age-related elements and as to Z.H. being a dependent in his care. Hicks focuses on whether there is sufficient evidence (1) that he knowingly placed Z.H. in danger by delaying medical treatment and (2) that the delay of treatment resulted in Z.H.'s death.

## Mens Rea

[13] "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b). For the purposes of the neglect statute, "the accused must have been subjectively aware of a high probability that he placed the dependent in a dangerous situation." *Armour v. State*, 479 N.E.2d 1294, 1297 (Ind. 1985).

[14] The evidence favorable to the verdict indicates that Z.H. was severely injured at some point on June 6, 2016, when Hicks and Culpepper were in the house. Hicks told Z.H.'s physician that he fed Z.H. around the time that the technician was present, and that Z.H. ate normally. Z.H.'s physician opined that due to the severity of Z.H.'s injuries, Z.H. would have exhibited symptoms right away. Z.H. could not have had a bottle without vomiting and likely lost consciousness after the trauma. The evidence, then, indicates that Z.H. became injured after 8:45 a.m., which was when the technician left. There was also evidence that Z.H. was injured as much as "half an hour to an hour," Tr. Vol. III at 141, before the ambulance arrived around 10:05 a.m. Thus, the jury could reasonably conclude that Z.H. suffered the injuries almost an hour before Hicks

called 9-1-1 at 10:00 a.m.—and long before Hicks researched severe brain injuries at 9:52 a.m.  As to Z.H.'s injuries, there was medical testimony that the injuries were non-accidental, consistent with Z.H. being squeezed—fracturing one of Z.H.'s ribs—and shaken to the point that his limbs flailed, causing fractures at the ends of his bones.  There was also evidence that Z.H. was wearing only a diaper when Hicks gave Z.H. to emergency responders, but that a bloody garment was recovered from the residence.  The garment had Z.H.'s blood on the back collar, which corresponded to the area of an abrasion on Z.H.'s head.  Hicks also gave several different accounts of the morning's events.

[15]  Hicks asserts that many of Z.H.'s injuries were "internal and, for that matter, invisible."  Appellant's Br. at 11.  Yet, the nature of the injuries was apparent enough for Hicks to conduct targeted research on the same type of injury that Z.H. had sustained.  What is more, the removal of the bloody garment and Hicks's differing accounts collectively evince a consciousness of guilt.  Next, to the extent Hicks seeks to avoid culpability by suggesting the delay was brief and inconsequential—directing us to the period between conducting research and calling 9-1-1—we do not reweigh the evidence, instead, the evidence supports a determination that Z.H. was injured well before Hicks downloaded this research to his phone.  Furthermore, it is the role of the fact-finder to determine whether a particular delay amounts to neglect.  *See Lush v. State*, 783 N.E.2d 1191, 1198 (Ind. Ct. App. 2003) (declining to reweigh evidence where "[t]he jury found that under the facts and circumstances . . . a fifteen-minute delay was a deprivation of medical care.").  Ultimately, from the evidence adduced at

trial, a jury could reasonably conclude that Hicks was aware of a high probability that Z.H. needed medical care, and that Hicks knowingly endangered Z.H.'s life by failing to promptly seek that care.

## Neglectful Act Resulting in Death

[16] Hicks also challenges the sufficiency of evidence that the alleged neglectful act—the failure to seek medical attention—resulted in Z.H.'s death. This Court has determined that "the phrase 'results in the death of a dependent' for purposes of the neglect statute . . . implicates proximate causation." *Patel v. State*, 60 N.E.3d 1041, 1052 (Ind. Ct. App. 2016). Under this standard, the State must, at a minimum, prove beyond a reasonable doubt that the death would not have occurred "but for" the neglectful act. *Id.*

[17] At trial, the State called Doctor Tara Harris ("Dr. Harris"), one of Z.H.'s treating physicians. Dr. Harris opined that, had Z.H. received medical attention immediately after the trauma, there would have been a range of treatment options available. Those options included putting Z.H. on a ventilator to keep his oxygen levels up, which would have "prevented [a] hypoxic [e]ffect on the brain." Tr. Vol. III at 120. There also would have been "lots of medication interventions" available. *Id.* Moreover, if necessary, physicians could have taken the "dramatic step" of "cut[ting] off a piece of the bone of the skull to give the brain some room to swell." *Id.* However, Dr. Harris explained that these options were not available because Z.H.'s "brain injury was already so progressed" by the time he got to the hospital. *Id.* By that

time, Z.H.'s blood had become acidic from a prolonged lack of oxygen, and he was so cold that his temperature would not register. According to Dr. Harris, it was "unusual" for an infant to be that cold, as it was not in the middle of winter "where he would have gotten really cold during transport." *Id.* at 119.

[18] Although Dr. Harris could not definitively say if the interventions would have been successful, it is the role of the fact-finder to weigh evidence, evaluate witness credibility, and determine culpability in circumstances like these. Here, based upon the medical testimony and the nature of Z.H.'s injuries, the jury could reasonably conclude that time was of the essence—and that with every moment of delay, Hicks took away another treatment option. Furthermore, irrespective of who injured Z.H., the evidence indicates that Hicks was present during the trauma, that Hicks appreciated the severity of the injuries, and that Hicks should have immediately sought treatment to preserve his child's life. Ultimately, from the evidence, a jury could determine beyond a reasonable doubt that, but for the delay in medical treatment, Z.H. would not have died.

[19] There is sufficient evidence supporting the conviction.

[20] Affirmed.

Mathias, J., and Bradford, J., concur.