

FILED

Nov 30 2020, 9:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darren Bedwell
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Briana Michelle Wilson,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

November 30, 2020

Court of Appeals Case No.
19A-CR-1987

Appeal from the Marion Superior
Court

The Honorable Barbara Crawford,
Judge

Trial Court Cause No.
49G01-1705-MR-18560

**Najam, Judge.**

## Statement of the Case

Briana Michelle Wilson appeals her conviction for murder, a felony, following a jury trial. Wilson raises two issues for our review, which we restate as follows:

1.      Whether the trial court abused its discretion when, at the sentencing hearing on Wilson's plea agreement for voluntary manslaughter, the court rejected Wilson's plea agreement after Wilson testified that she had shot the victim in self-defense while he was attacking her.

2.      Whether the trial court abused its discretion when, at the ensuing jury trial, it declined to instruct the jury on voluntary manslaughter as a lesser-included offense to murder.

We affirm.

## Facts and Procedural History

On April 29, 2017, Wilson shot and killed Maurice Martinez inside her apartment. The State charged Wilson with murder. On the morning of her scheduled jury trial in February of 2019, Wilson agreed to plead guilty to voluntary manslaughter, as a Level 2 felony, pursuant to a written plea agreement. In exchange for her plea, the State agreed to dismiss the murder charge and to agree to a cap of fifteen years executed as Wilson's sentence.

The court asked the parties for a factual basis for the plea, and the State provided the following basis:

> on April 29, 2017, [Wilson] knowingly killed another human being that being Maurice Martinez, while acting under sudden heat . . . . Upon arrival [officers] found a[n] individual who was identified as Maurice Martinez, suffering from several gunshot wounds. Mr. Martinez was transported to Eskenazi Hospital where later his condition was pronounced deceased . . . . On the scene as well, who was identified as the Defendant, Briana

Wilson, and [her] cousin [R.T.]; those individuals were transported to the [IMPD] Homicide Office. Inside the apartment at the location, was located [a] 9-millimeter handgun, as well as spent 9-millimeter shell casings which were subsequently forensically matched to the firearm found in that location. Detective Gary Toms was assigned as the lead Homicide Detective on the case. Detective Toms did speak with [Wilson] and she was advised of and waived her rights. In the course of the interview, [Wilson] relayed the following: she stated that earlier the previous day she had met with an individual that she knew as "Derrick" at the O'Reilley Auto Parts and that she started texting this man named "Derrick[,"] who we have identified to be Mr. Maurice Martinez. After some exchange back and forth, [Wilson] did ultimately invite over Mr. Martinez to her apartment to hang out with her and as well as her cousin [R.T.] At that time Mr. Martinez was initially acting normally. There was no sort of altercation or anything that started at that point. [Wilson] and Mr. Martinez continued to hangout throughout the evening. They shared some drinks and had some conversations. At one point, Mr. Martinez believed that one (1) of the two (2) individuals[,] either [Wilson] or [R.T.], . . . had taken money from him. At that point, Mr. Martinez became fairly hostile and demanding both from [Wilson] and her cousin to return the money that he believed they had taken from him at that time. [Wilson] denied . . . taking the money, as well as the cousin denied taking the money. Mr. Martinez continued to be hostile, threatening and did ultimately end up putting his hands on [Wilson]. According to [Wilson], pushing and grabbing her neck and attempting to choke her. At that point, [Wilson] began pushing back again[st Martinez] and telling him to leave and demanding he leave the premises. [Martinez] did back off somewhat and started heading to the front door of the apartment but to continue to utter threats as he walked to the front door. At that time . . . , [Martinez] then issued a final threat as he was about to walk out the door. According to [Wilson], at that point she produced a handgun and shot him multiple times . . . .

Supp. Tr. at 15-16. Wilson agreed with that factual basis. The court then stated that it was "going to take this plea under advisement and . . . enter[] . . . an order of conviction for the offense of Voluntary Manslaughter." *Id.* at 17. The court's chronological case summary ("CCS") states that the court entered "[j]udgment" on the voluntary manslaughter charge at this time. Appellant's App. Vol. II at 20. The court then set the matter for a sentencing hearing.

[5] In the interim, the State prepared the pre-sentence investigation report ("the PSI"). In the course of preparing the PSI, interviewers met with Wilson. During her interview:

> The plea agreement was reviewed with [Wilson.] While reviewing the plea agreement, [she] indicated she was somewhat confused about the plea agreement. She asked, "So I'm not guilty of murder?" The plea agreement was reviewed with her again. She then stated her attorney did not go over the plea agreement with her, and said he told her that "everything was going to be okay." She asked, "So I did sign guilty for Manslaughter?" The plea agreement was read to her a third time, and she stated, "Yeah, that's better than murder." Ms. Wilson also stated, "I hope everything goes well with the Judge."

*Id.* at 152. She further told the interviewers that her family did not hold this offense against her because they "know it was self-defense." *Id.* at 153.

[6] At her ensuing sentencing hearing, the trial court expressed concern about whether Wilson had entered her plea knowingly and voluntarily based on her statements in the PSI. Wilson's counsel called Wilson to testify in order to ensure that she was entering into her plea knowingly and voluntarily. Wilson's

counsel asked Wilson about the terms of the plea agreement, her trial rights, and whether it was her decision to enter into the plea agreement, and Wilson again confirmed that she understood the agreement and her rights and that she desired to plead guilty to voluntary manslaughter.

[7] The State then cross-examined Wilson as follows:

> Q. Okay Ms. Wilson, I understand that you agree with your attorney that you signed everything. You understand that you admitted to shooting Maurice Martinez that day?
>
> A. Yes.
>
> Q. And you admitted that you did not do that in self-defense; that you did that and you killed him?
>
> A. No.
>
> Q. You understand that you did not shoot Mr. Martinez in self-defense?
>
> A. It was self-defense.

Supp. Tr. at 37. The State then asked to speak to the court, but the court first asked Wilson to clarify the factual basis for the plea agreement. Wilson responded:

> He was violating me in my own home and he also violated [R.T.] He touched on her and he threatened to kill me, and he said that I had stole [sic] eighty . . . dollar[s] from him which I don't have to steal anything from no one. He pulled on my arm and he said

he was going to take me out to his car and shoot me. That's what he said and I got loose and I went and got my gun and I shot him because he was dragging me out of my house by my arm[1] . . . .

*Id.* at 37-38.

[8] The court then held a sidebar with the attorneys and stated that the court was "having a problem accepting this plea" because Wilson "believes she was protecting herself." *Id.* at 38. The court further stated that it "thought [it] just took [the plea agreement] under advisement" at the guilty plea hearing and had not yet accepted that agreement. *Id.* at 39. The record on appeal does not reflect that Wilson objected or otherwise challenged the trial court's assessment that the acceptance of the plea agreement was still under advisement.[2]

---

[1] Wilson's last sentence was not part of the original factual basis for her guilty plea at the guilty plea hearing, and, indeed, there was no evidence of a simultaneous attack presented to the jury at her later trial.

[2] The transcript from the sentencing hearing states:

> [Deputy Prosecutor]: [W]e only did the factual basis at the last hearing.
>
> THE COURT: I thought I just took it under advisement.
>
> [Deputy Prosecutor]: Oh, okay.
>
> [Wilson's counsel]: (inaudible)
>
> [Deputy Prosecutor]: Okay, good.
>
> [Wilson's counsel]: (inaudible)
>
> THE COURT: You may ask.
>
> [Wilson's counsel]: Thanks.

Supp. Tr. at 39. Wilson has not filed a statement of evidence pursuant to Indiana Appellate Rule 31 or a motion to correct or modify the transcript pursuant to Indiana Appellate Rule 32 with respect to the "inaudible" portions of that transcript.

Wilson's counsel then requested an opportunity to reexamine Wilson, which the court granted. The following exchange occurred:

Q. And then what was Mr. Martinez's reaction to not being able to find the money?

A. Threatening us, saying stuff to us, trying to violate us.

Q. You said he threatened you, what did he say?

A. He said he was going to get his gun and he was going to shoot me.

Q. Okay.

A. That was his words [sic].

Q. Okay, but did he have a gun on his person or not?

A. Not.

Q. He did not have a gun?

A. No.

Q. Okay. He said he was going to get a gun from where?

A. His car.

Q. And again, you live in an apartment complex. Right?

A. Yes.

Q. And his car was parked out in the parking lot?

A. Yes.

Q. Okay.

A. In front of the house.

Q. Mr. Martinez was leaving your apartment. Is that right?

A. He was leaving.

Q. Okay.

A. He was dragging me, but he was leaving.

*Id.* at 41-42. Following Wilson's last statement, the State spoke up. *Id.* at 42. The court then stated that it "is not going to be able to accept this plea agreement based on what Ms. Wilson says . . . . This is not Voluntary Manslaughter, she raises the [defense of] Self-Defense. So I am going to reset this for trial." *Id.*

[10] At Wilson's ensuing jury trial, the State presented evidence to show that Wilson had shot Martinez twice in the back. The jury also considered Wilson's statement to Detective Toms shortly after the shooting. According to that statement:

Wilson and [her juvenile cousin, R.T.,] went to O'Reilly Auto Parts earlier in the day. Here, she met Maurice Martinez . . . . Wilson exchanged numbers with Martinez, and he told her that he wanted to hang out with her later. Martinez later called Wilson and tried to get her to go to a room . . . . Wilson declined to go to a room but arranged for Martinez to come to her apartment. Martinez arrived at Wilson's apartment later that evening . . . . After some time, Wilson stated that she and Martinez engaged in consensual sex . . . . However, Wilson noticed . . . that Martinez was not using protection. Wilson then ended the sexual encounter with Martinez[] and believed this caused him to become upset.

Wilson then went upstairs to her room because of the situation. Martinez then followed her upstairs . . . and told her that he still wanted to date her. Wilson asked Martinez to get his stuff and leave at that point. He went downstairs and got his pants . . . . Martinez then started checking his pants pockets. Wilson stated that Martinez had a bunch of credit cards and some money originally. After searching his pockets, Martinez told Wilson that his money was missing. Martinez then accused R.T. of taking his money while he was talking to Wilson. Wilson told Martinez that R.T. did not take his money . . . . Wilson then told Martinez to go downstairs and she would help him find the money . . . but [they] did not find the money. Martinez then told Wilson . . . that he suspected R.T. of having his money . . . . According to Wilson, Martinez made a threat that Wilson's home will be shot at, and that the blame would fall on [Wilson]. . . .

According to Wilson, Martinez then got on his phone and started giving people her address and saying[,] "I'm over this bitch house and they took my money." Martinez then grabbed Wilson by the neck and told her to tell R.T. to give him his money. Wilson asked R.T. if she had Martinez' money. R.T. told Wilson that she did not have Martinez' money. . . . According to Wilson,

Martinez then said, "ok.  Y'all bitches ain't got my money.  I'm going to go out to the car and get my gun and come back and shoot both of y'all bitches."  Martinez then told Wilson to go out to his car with him.

Wilson would go on to explain that[,] when she came back downstairs after Martinez, she brought her purse with her and that her gun was in her purse.  Wilson stated that she put her gun in a drawer in the kitchen because she was afraid Martinez was going to find her gun in her purse.  Wilson stated she did not think that Martinez was playing around[] based on his previous actions and threats.  Additionally, Wilson stated that Martinez bragged about killings and robberies he had committed.  Wilson then admitted to shooting Martinez, but that she did not shoot him to kill him.  She just did not want him to go outside and get the gun and come back inside and kill her and R.T.

Wilson explained that Martinez was by her front door step when she shot him, and the front door was open.  Wilson stated that Martinez had unlocked and opened the front door and then said that he was going out to the car to get his gun . . . .

* * *

When asked about whether she knew how much money Martinez had, Wilson stated that Martinez had a bunch of $1's and a $10.  She then stated that Martinez claimed $80 was taken . . . .  Wilson denied any other physical assault other than the choking.  She estimated being choked for approximately two (2) minutes . . . .  During the statement and afterward, Detective Toms observed [Wilson's] neck and saw no marks or sign of physical trauma; furthermore, Detective Toms checked Wilson's eyes and observed no physical indicia of strangulation . . . .

Appellant's App. Vol. II at 33-35.

[11] Wilson called R.T. to testify at the trial. R.T. did not testify to any physical attack by Martinez. Instead, she testified that Martinez had been yelling about the missing money, that he said he was going to get his gun to "kill me and [Wilson]," and that Wilson then shot him. Tr. Vol. III at 40.

[12] Wilson requested a jury instruction for voluntary manslaughter. The trial court declined the request on the ground that there was no serious evidentiary dispute as to whether Wilson had shot Martinez in sudden heat. However, the court did instruct the jury, at Wilson's request, on the defense of self-defense. The jury found Wilson guilty of murder. The trial court then sentenced Wilson to fifty-five years, with ten years suspended. This appeal ensued.

## Discussion and Decision

### *Issue One: The Court's Rejection of Wilson's Plea Agreement*

[13] On appeal, Wilson first asserts that the trial court abused its discretion when it rejected her plea agreement. Our trial courts "enjoy considerable discretion in deciding whether to accept or reject a proposed plea agreement." *Rodriguez v. State*, 129 N.E.3d 789, 794 (Ind. 2019). We review such decisions for an abuse of that discretion, which occurs only where the trial court's decision is clearly against the logic and effects of the facts and circumstances before the court, or if the court misapplies the law. *E.g.*, *Dycus v. State*, 108 N.E.3d 301, 303 (Ind. 2018).

[14] Wilson initially contends that the trial court accepted her plea agreement at the guilty plea hearing and, as such, it had no discretion to then reconsider whether

to accept the agreement at the ensuing sentencing hearing. At the conclusion of the guilty plea hearing, the court orally informed the parties that it was "going to take this plea under advisement and . . . enter[] . . . an order of conviction for the offense of Voluntary Manslaughter." Supp. Tr. at 17. That statement is inconsistent and, hence, ambiguous because the court both took the plea agreement under advisement and entered a judgment of conviction on the offense of voluntary manslaughter as if Wilson's guilty plea were an open plea.

[15] The court's CCS states that the court entered "[j]udgment" on the voluntary manslaughter charge the day of the guilty plea hearing. Appellant's App. Vol. II at 20. Generally, "the trial court speaks through its CCS . . . and this court is limited in its authority to look behind the CCS to examine whether an event recorded therein actually occurred." *City of Indianapolis v. Hicks*, 932 N.E.2d 227, 233 (Ind. Ct. App. 2010), *trans. denied*. However, one of those limited circumstances is when the record as a whole demonstrates that the CCS entries are "factually inaccurate." *Id.* at 234 (discussing *Gibson v. State*, 910 N.E.2d 263, 268 (Ind. Ct. App. 2009)).

[16] Here, we are obliged to conclude that the record as a whole demonstrates that the purported entry of judgment in the CCS is factually inaccurate. First, the CCS entry is incomplete on its face as it makes no reference to the plea agreement, which leaves the mistaken impression that Wilson's plea was an open plea. Second, at the sentencing hearing, the court stated that it had taken the plea agreement under advisement. Thus, the purported entry of judgment for voluntary manslaughter based upon a plea agreement that the court had not

yet accepted was, at best, provisional and contingent upon whether the court would ultimately accept the agreement. And, critically, the record on appeal does not reflect that Wilson objected or did anything other than assent to the court's statement that the plea agreement was in fact still under advisement.

[17] Accordingly, we must conclude that the trial court's oral comments at the guilty plea hearing and the CCS entry for that day are not conclusive as to whether the trial court accepted Wilson's plea agreement or took it under advisement. We further conclude that, when the trial court made clear at the sentencing hearing that its position was that it had only taken the plea agreement under advisement, Wilson had the affirmative duty to object or otherwise make a record that the plea agreement had in fact already been accepted. Instead, the record on appeal does not show that Wilson did anything other than assent to the trial court's determination. We therefore conclude that Wilson has not met her burden on appeal to show that the trial court accepted her agreement at the guilty plea hearing.

[18] Wilson next contends that the court abused its discretion when it rejected her plea agreement at the sentencing hearing. Wilson asserts that her comment that she had acted in "self-defense" was not a legal conclusion. She further asserts that her comment also was not a claim of innocence but a plea for leniency. The State, in turn, contests those arguments.

[19] We need not decide whether Wilson's statements were attempts at legal conclusions or were claims of innocence. Our standard of review in this appeal

is deferential and controls the outcome here. The factual basis submitted to the court on the plea agreement could have been found by a jury to establish the offense of murder, a mitigated offense of voluntary manslaughter, or an exculpatory act of self-defense. In such circumstances, it was within the trial court's discretion to reject the plea agreement and have that call be made by the jury. We therefore cannot say that the trial court abused its discretion when it rejected Wilson's plea agreement.

## Issue Two: Jury Instructions

[20] Wilson next contends that the trial court abused its discretion when it declined to instruct the jury on voluntary manslaughter as a lesser-included offense to murder. As our Supreme Court has explained:

> To determine whether to instruct a jury on a lesser included offense, the trial court must engage in a three-part analysis. The first two parts require the trial court to consider whether the lesser included offense is inherently or factually included in the greater offense. If it is, then the trial court must determine if there is a serious evidentiary dispute regarding the element that distinguishes the lesser offense from the principal charge. . . .
>
> When considering whether there is a serious evidentiary dispute, the trial court examines the evidence presented by both parties regarding the element(s) distinguishing the greater offense from the lesser one. This involves evaluating the weight and credibility of the evidence, and then determining the seriousness of any resulting dispute. Because the trial court found no serious evidentiary dispute existed, we will reverse only if that finding was an abuse of discretion. In our review, we accord the trial court considerable deference, view the evidence in a light most favorable to the decision, and determine whether the trial court's

decision can be justified in light of the evidence and circumstances of the case.

*Leonard v. State*, 80 N.E.3d 878, 885 (Ind. 2017) (cleaned up).

[21] The only question on this issue is whether there was a serious evidentiary dispute before the jury on the question of sudden heat, which distinguishes voluntary manslaughter from murder. *See* Ind. Code § 35-42-1-3 (2020). "Sudden heat exists when a defendant is 'provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection.'" *Brantley v. State*, 91 N.E.3d 566, 572 (Ind. 2018) (quoting *Isom v. State*, 31 N.E.3d 469, 486 (Ind. 2015)). Wilson asserts that the evidence before the jury created a serious evidentiary dispute as to whether she had shot Martinez out of terror.

[22] We cannot agree with Wilson's argument on appeal. Wilson's statement to Detective Toms the day of the shooting was that, at some point prior to shooting Martinez, he had grabbed her around the neck and choked her. It is not clear precisely when that choking purportedly happened, but it is clear that it was not simultaneous with the shooting. Indeed, in this respect, the evidence before the jury was not consistent with Wilson's testimony to the trial court at the sentencing hearing on her guilty plea, in which Wilson testified that she shot Martinez while he was "dragging" her out of the apartment. Supp. Tr. at

37-38, 41-42. Again, Wilson presented no such evidence to the jury of an attack simultaneous with the shooting.[3]

[23] Moreover, the evidence of any physical attack by Martinez was inconclusive. There was no other evidence corroborating Wilson's claim. Detective Toms stated that Wilson had no abrasions, bruises, or bloodshot eyes that might have resulted from such an attack. And Wilson's only witness, R.T., did not testify that a physical attack had occurred.

[24] Further, while Martinez's statement that he was going to go get his gun out of his car and kill Martinez and R.T. might have been upsetting, "words alone are not sufficient provocation to reduce murder to manslaughter." *Isom*, 31 N.E.3d at 486 (quotation marks omitted). Wilson therefore cannot rely only on Martinez's words as a basis for showing that she acted in sudden heat.

[25] Finally, the real thrust of Wilson's argument is not that any one of those factors shows sudden heat but that, when taken together, they do. But we are, at best, left with an uncorroborated—if not contradicted—claim of an attack some time prior to a shooting along with Martinez's statement that he would return with a gun. Even if under these circumstances the trial court could have given an instruction on voluntary manslaughter, we cannot say that the trial court

---

[3] In her brief on appeal, Wilson states that her 9-1-1 calls shortly before and immediately after the shooting show that Martinez "tried to force Wilson to walk out to the car with him" when she shot him. Appellant's Br. at 37-38. But the transcript of Wilson's second 9-1-1 call does not reflect that characterization and instead is consistent with her statement to Detective Toms that, at some time prior to shooting him, Martinez had choked her. Appellant's App. Vol. II at 37-39.

abused its discretion when it declined to do so. *See Snow v. State*, 77 N.E.3d 173, 177 (Ind. 2017) ("discretion means that, in many cases, trial judges have options."). It was the trial court's prerogative to consider "the weight and credibility of the evidence" in "determining the seriousness" of any evidentiary dispute for purposes of deciding whether to instruct the jury on voluntary manslaughter as a lesser-included offense to murder. *Leonard*, 80 N.E.3d at 885. We cannot say that the trial court abused its discretion on this record. Accordingly, we affirm Wilson's conviction for murder.

[26] Affirmed.

Riley, J., and Crone, J., concur.