

FILED
Apr 20 2023, 8:32 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Robert M. Yoke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brandon L. Pritcher,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | April 20, 2023<br><br>Court of Appeals Case No.<br>22A-CR-2196<br><br>Appeal from the Vigo Superior<br>Court<br><br>The Honorable Sarah K. Mullican,<br>Judge<br><br>Trial Court Cause No.<br>84D03-2009-MR-3218 |

**Opinion by Judge Tavitas**
Judges Vaidik and Weissmann concur.

**Tavitas, Judge.**

## Case Summary

[1] Following a jury trial, Brandon Pritcher was convicted of murder and sentenced to the maximum term of sixty-five years of incarceration. Pritcher appeals and claims that: (1) the prosecutor committed misconduct constituting fundamental error by misstating the law during closing argument; (2) the State failed to present sufficient evidence to support Pritcher's conviction; and (3) his sixty-five-year sentence is inappropriate in light of the nature of Pritcher's offense and his character. We disagree and, accordingly, affirm.

## Issues

[2] Pritcher presents three issues on appeal, which we restate as:

I. Whether the prosecutor committed misconduct constituting fundamental error by misstating the law during closing argument.

II. Whether the State presented sufficient evidence to support Pritcher's conviction.

III. Whether Pritcher's sixty-five year sentence is inappropriate in light of the nature of the offense and the character of the offender.

## Facts

[3] In 2020, Pritcher lived with his girlfriend, Felicia Mize, Pritcher's seven-year-old son, L.P., and Mize's daughter. In June of that year, Pritcher's relationship with Mize ended, and he and L.P. lived alone. After the breakup of his

relationship with Mize, Pritcher became very angry and was "short fused." Tr. Vol. II p. 161. Although their relationship ended, Pritcher and Mize still texted and telephoned each other.

[4] In September 2020, Pritcher became irate with L.P. because, Pritcher claimed, L.P. had stolen money out of a piggy bank belonging to Mize's daughter. L.P.'s mother, Raven Layton, also saw Pritcher acting "irritable and angry" toward L.P. *Id*. at 162. On September 17, Pritcher telephoned Mize and informed her that he believed L.P. had stolen Pritcher's loaded handgun. On September 18, Valarie Wade, Pritcher's neighbor, saw Pritcher outside with L.P. Pritcher went to Wade's home and told her that L.P. had been stealing and asked Wade to speak with L.P. about the alleged stealing. Wade observed that L.P. was crying, shaking, and appeared to be terrified.

[5] On September 19, Mize woke up shortly before 5:00 a.m. and saw that she had missed several calls from Pritcher and that Pritcher had sent her several text messages. Among the messages Pritcher sent to Mize were, "Not kidding nothing I accidentally kill lamp," and, "I'm going to jail for a while I love you hate me I think I." Ex. Vol. VI, State's Ex. 37 (spelling and grammatical errors in original). Mize believed "lamp" was how Pritcher's phone auto-corrected L.P.'s first name. Tr. Vol. II p. 125. Mize responded by texting, "Whats going om are you ok," and "Why do you keep saying you're going to jail." Ex. Vol. VI, State's Ex. 37 (spelling and grammatical errors in original). Pritcher responded, "I'm going to jail." *Id*.

[6] At 5:03 a.m. on September 19, Pritcher called 911, and Detective Darryl Cooley of the Terre Haute Police Department ("THPD") arrived on the scene four minutes later. When Detective Cooley arrived, Pritcher came out of his house carrying L.P.'s limp body. Detective Cooley performed CPR on L.P. until emergency medical personnel arrived. The medics put a breathing tube in L.P. and transported him to a local hospital. Due to the severity of his injuries, L.P. was flown to Riley Children's Hospital in Indianapolis.

[7] Between 5:30 a.m. and 6:00 a.m. on September 19, Mize spoke with Pritcher on the phone. Pritcher told Mize that L.P. was stealing money but that L.P. denied doing so. Accordingly, Pritcher said, he "beat [L.P.'s] ass." Tr. Vol. II p. 127. Pritcher told Mize that L.P. went into his bedroom and began to beat his head against the metal bunkbed and choked himself. Pritcher claimed that, after this, L.P. made a strange sound and fell to the floor unconscious. Pritcher told Mize that he attempted to revive L.P. by splashing cold water on the boy's face. He also claimed to have performed CPR on L.P. until the police arrived.

[8] At approximately 5:30 a.m. that morning, Pritcher telephoned L.P.'s mother, Layton, but hung up before she could answer the phone. Layton repeatedly tried to call Pritcher back, and when he finally answered, Pritcher told Layton that he "whipp[ed] [L.P.']s ass" because he caught the boy looking in the couch for change. *Id*. at 165. Pritcher repeated his story that L.P. locked himself in his room and banged his head until he was unconscious. Pritcher told Layton that she needed to go to the local hospital where L.P. had been taken.

[9] When L.P. arrived at Riley, he was alive but in very poor condition. Medical examination of L.P. revealed that he had suffered from horrific abuse. He was covered in bruises "from head-to-toe," Tr. Vol. III p. 139, and had bruises on both ears, his eyes, forehead, arms, legs, both buttocks, and had scratches on his side. The bruises were consistent with repeated, high-velocity blows, which is consistent with child abuse. The bruising on L.P.'s buttocks were from a spanking injury, and the bruises to L.P.'s ears were caused by someone grabbing the child "by the ear and shak[ing] [his] head." *Id*. at 57. L.P. had anemia due to internal hemorrhaging in his brain. Doctors at Riley determined that L.P. would not survive, and he was pronounced dead the following day. L.P. died as a result of blunt-force injuries to the head that caused numerous subgaleal hemorrhages and a subdural hemorrhage. The death was determined to be a homicide.

[10] As L.P. was being transported to the hospital, Pritcher spoke with Detective Cooley at Pritcher's home. Pritcher told Detective Cooley that L.P. was a pathological liar who had been stealing money to give to L.P.'s mother, Layton. Pritcher also claimed that L.P. had "anger issues." Tr. Vol. II p. 194. Pritcher admitted that he had spanked L.P. for his alleged stealing, after which, Pritcher claimed, L.P. locked himself inside his bedroom. Pritcher told Cooley that he had to break down the door to L.P.'s room, at which point L.P. began to bang his head against the wall and bunkbed. After this, Pritcher claimed, L.P. "squeal[ed]," fell to the floor, and was unresponsive. *Id*. Pritcher told

Detective Cooley that he did not immediately call 911 because he thought L.P. would "come around." *Id*. at 199.

[11] The police took Pritcher to the police station, where they advised him of his *Miranda* rights. Pritcher agreed to speak with the detectives. Pritcher repeated his claims that L.P. was stealing money and was a pathological liar. Pritcher stated, "it's f**king obvious I beat his ass, but he's in there banging his f**king head off of s**t. . . . I mean, I beat his ass . . . I whipped his ass[.]" Tr. Vol. III p. 78. Pritcher stated that he let anger "get the best of [him]," that he "[k]ept whipping [L.P.] because [L.P.] was going to tell the f**king truth," and that he "kept whipping him then [L.P.] went into his room," where, Pritcher claimed, L.P. beat his own head and punched and smacked himself. *Id*. at 83. Pritcher admitted that he "popped [L.P.] on the back of the head." *Id*. at 95.

[12] The police subsequently searched Pritcher's home and discovered blood, later determined to be L.P.'s, on the floor and wall of the hallway. They also observed two round dents in the wall below the thermostat. These dents appeared to have been made by L.P.'s head hitting the wall. L.P.'s blood was found on the sink, toilet, and floor of the bathroom. The police found a belt belonging to Pritcher that had L.P.'s blood on it. L.P.'s bedroom door had been torn off the frame, but the police found no dents or blood on the frame of L.P.'s bed. The police also searched Pritcher's cell phone and discovered that he had deleted the text messages he had sent to Mize on the morning of September 19, in which he stated he thought he had killed L.P.

[13] On September 22, 2020, the State charged Pritcher with Count I: murder, a felony; Count II: neglect of a dependent resulting in death, a Level 1 felony; Count III: aggravated battery of a child less than fourteen years of age, a Level 1 felony; Count IV: domestic battery resulting in serious bodily injury to a person less than fourteen years of age, a Level 3 felony; and Count V: neglect of a dependent resulting in serious bodily injury, a Level 3 felony.

[14] The trial court held a jury trial from July 11 to July 14, 2022. During closing statements, the prosecuting attorney argued to the jury that, to meet the statutory definition of "knowingly," Pritcher "had to have known when he did this that it could result in [L.P.]'s death." Tr. Vol. IV p. 54. Defense counsel argued that Pritcher did not knowingly kill L.P. In rebuttal, the prosecuting attorney's arguments included the following statements:

> This is knowingly. A person . . . engages in conduct knowingly if, if he engages in this conduct, he is aware of a high probability of doing so. In other words, he's not sleep-walking; he's not doing, he didn't stumble over somebody. He is aware of a high probability of what he's doing. **He doesn't have to know that when he hits that kid on the back of the head it's gonna kill him. Doesn't have to know that. He just has to know that when he's throwing that kid down or against the wall or whatever, that he is aware that that is what he's doing. That's what knowingly is. He doesn't have to know this is gonna result in this death. He has to know . . . what he's doing. And then the other element is, that did result in his death. He doesn't have to know that that's what's gonna happen.** However, he knew that what he was doing was pretty damn bad.

Tr. Vol. IV p. 69 (emphasis added).  Pritcher did not object to these statements, request an admonishment, or move for a mistrial.

[15]    The trial court's final instructions to the jury included the statutory definition of the charged crime of murder as follows:

> A person who knowingly or intentionally kills another human being commits Murder, a Felony.
>
> Before you may convict the Defendant, the State must have proved each of the following beyond a reasonable doubt:
>
>    1.  The Defendant Brandon L. Pritcher;
>
>    2.  knowingly or intentionally;
>
>    3.  killed;
>
>    4.  L.P.
>
> If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of Murder, a Felony, as charged in Count 1.

Appellant's App. Vol. II p. 122.  The trial court also instructed the jury on the statutory definition of the *mens rea* of "knowingly," as follows:

> A person engages in conduct "knowingly" if, when he engages in this conduct, he is aware of a high probability that he is doing so.

*Id*. at 128.  This is an almost verbatim quote of Indiana Code Section 35-41-2-2(b).  The court's instructions also informed the jury that "[s]tatements made by the attorneys are not evidence," *id.* at 137, and that the court's instructions "are

your best source in determining the law." *Id.* at 117. The jury found Pritcher guilty as charged on all counts.

[16] The trial court held a sentencing hearing on August 16, 2022. The court found as aggravating that Pritcher's history of juvenile and adult criminal behavior, though not terribly lengthy, was "quite disturbing and reflects poorly on his character." Appellant's App. Vol. II p. 246. Specifically, Pritcher had juvenile adjudications for what would be, if committed by an adult, sexual battery, a Class D felony, and criminal confinement, a Class D felony. The factual basis for this adjudication was that Pritcher forced his victim to have sex while another individual held her down and placed a shirt in her mouth to gag her.

[17] As an adult, Pritcher had a criminal conviction for underage consumption of an alcoholic beverage, a Class C misdemeanor. The court also found as aggravating that L.P. was only seven years old when Pritcher killed him. The trial court assigned great aggravating weight to the fact that Pritcher was L.P.'s father and had care and custody of L.P. The court also found as aggravating that L.P.'s injuries were "some of the most disturbing evidence this Court has observed." *Id.* at 247. Lastly, the court noted that, after fatally beating L.P., Pritcher chose to call and message his girlfriend instead of immediately seeking medical aid, which demonstrated a "shocking disregard for the life and health of his child." *Id.*

[18] As mitigating, the trial court noted that: Pritcher had a history of mental health issues, including bipolar disorder, PTSD, and borderline personality disorder;

Pritcher had been a victim of sexual abuse as a child; and Pritcher had suffered from concussions as a juvenile. The trial court assigned these factors little mitigating weight and determined that the aggravators greatly outweighed the mitigators. The trial court entered judgment of conviction only on the murder verdict, due to double jeopardy concerns, and imposed the maximum sixty-five year sentence. Pritcher now appeals.[1]

## Discussion and Decision

### I. Fundamental Error Due to Prosecutor's Misstatements of the Law

Pritcher first argues that fundamental error occurred because the prosecuting attorney committed misconduct by misstating the law regarding the State's burden of proof during the State's rebuttal to Pritcher's closing statement. Pritcher argues fundamental error because he acknowledges that he failed to object to the prosecutor's comments at trial and failed to request an admonishment to the jury or move for a mistrial. These steps are required to preserve a claim of prosecutorial misconduct for appeal. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014).

When a claim of prosecutorial misconduct has been waived due to failure to properly raise the claim in the trial court, the defendant on appeal must establish not only the grounds for prosecutorial misconduct but must also

---

[1] We held oral argument in this case on March 16, 2023, at Andrean High School in Merrillville, Indiana. We extend our thanks to the administration, faculty, and students of the school for their hospitality, and we commend counsel for the quality of their arguments.

establish that the prosecutor's conduct constituted fundamental error. *Ryan*, 9
N.E.3d at 667-68 (citing *Booher v. State*, 773 N.E.2d 814, 817-18 (Ind. 2002)). In
*Ryan*, our Supreme Court explained in some detail the difficulty of establishing
fundamental error on appeal:

> Fundamental error is an extremely narrow exception to the
> waiver rule where the defendant faces the heavy burden of
> showing that the alleged errors are so prejudicial to the
> defendant's rights as to make a fair trial impossible. In other
> words, to establish fundamental error, the defendant must show
> that, under the circumstances, the trial judge erred in not *sua
> sponte* raising the issue because alleged errors (a) constitute clearly
> blatant violations of basic and elementary principles of due
> process and (b) present an undeniable and substantial potential
> for harm. The element of such harm is not established by the fact
> of ultimate conviction but rather depends upon whether [the
> defendant's] right to a fair trial was detrimentally affected by the
> denial of procedural opportunities for the ascertainment of truth
> to which he otherwise would have been entitled. In evaluating
> the issue of fundamental error, our task in this case is to look at
> the alleged misconduct in the context of all that happened and all
> relevant information given to the jury—including evidence
> admitted at trial, closing argument, and jury instructions—to
> determine whether the misconduct had such an undeniable and
> substantial effect on the jury's decision that a fair trial was
> impossible.

9 N.E.3d at 668 (internal citations, quotations, and footnote omitted). The
*Ryan* Court also noted that an appellant "is 'highly unlikely' to prevail on a
claim of fundamental error relating to prosecutorial misconduct." *Id.* (citing
*Baer v. State*, 942 N.E.2d 80, 99 (Ind. 2011)).

[21]     In the present case, Pritcher argues that the prosecutor, during the State's rebuttal, told the jury that "Pritcher had to be aware of a high probability that he was . . . battering L.P.'s head, and not the prohibited conduct of killing L.P." Appellant's Br. p. 13. This, Pritcher argues, is incorrect because, to convict Pritcher of murder, the State had to prove that Pritcher was aware of a high probability that he would kill L.P., not simply batter him. Because the prosecutor misstated the law, Pritcher claims that the prosecutor committed prosecutorial misconduct. The State counters that the prosecutor's statements, taken as a whole, did not misstate the law.

[22]     We think it clear that the prosecutor's statement during rebuttal misstated the law. The prosecutor essentially argued that the jury need find only that Pritcher was aware of a high probability that he was beating L.P., not that he was aware of a high probability that he would kill L.P. Yet, in order to convict Pritcher of murder, the State had to prove that Pritcher was aware of a high probability that his conduct would kill L.P.

[23]     The question, then, is whether the prosecutor's misstatement of the law constitutes fundamental error. Pritcher claims that the prosecutor's misstatement of the law made a fair trial impossible because the jury could convict Pritcher for murder if he only knowingly **beat** L.P., even if he did not knowingly **kill** L.P. The State argues that, because the trial court properly instructed the jury with regard to the State's burden of proof and the elements of the crime, no fundamental error occurred. We agree with the State.

[24]     It is well settled that "the jury is presumed to follow the trial court's instructions and not law recited by counsel during arguments." *Laux v. State*, 985 N.E.2d 739, 750 (Ind. Ct. App. 2013). Thus, our courts have long held that any misstatement of law during closing arguments is presumably cured by the trial court's final jury instructions. *See Santiago v. State*, 985 N.E.2d 760, 764 n.2 (Ind. Ct. App. 2013); *Laux*, 985 N.E.2d at 750 (both citing *Hudgins v. State*, 451 N.E.2d 1087, 1091 (Ind. 1983)). "[C]losing arguments are rightly received by the jury as partisan advocacy, not impartial statements of the law, and thus are likely to have little effect on the jury's understanding of the law." *Castillo v. State*, 974 N.E.2d 458, 469 n.11 (Ind. 2012); *accord Ryan*, 9 N.E.3d at 668.

[25]     Here, the trial court's final instructions properly informed the jury that, before it could convict Pritcher of murder, the State had to prove beyond a reasonable doubt that Pritcher "knowingly" killed L.P. The final instructions also correctly defined the "knowingly" *mens rea*. Read together, the final instructions properly informed the jury that, to convict Pritcher of murder, the State had to prove beyond a reasonable doubt that Pritcher engaged in conduct by beating L.P. and that he was aware of a high probability that L.P. might die as a result. *See Leonard v. State*, 80 N.E.3d 878, 882 (Ind. 2017) ("A person knowingly kills when they are 'aware of a high probability' that their actions may kill.") (quoting I.C. § 35-41-2-2(b)). Under these facts and circumstances, the prosecutor's misstatement of the law did not amount to fundamental error.

## II. Sufficiency of the Evidence

[26] Pritcher next argues that the State presented insufficient evidence to support his conviction for murder. Claims of insufficient evidence "warrant a deferential standard, in which we neither reweigh the evidence nor judge witness credibility." *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020) (citing *Perry v. State*, 638 N.E.2d 1236, 1242 (Ind. 1994)). We consider only the evidence supporting the judgment and any reasonable inferences drawn from that evidence. *Id.* (citing *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *cert. denied*). "We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt." *Id.* We affirm the conviction "unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Sutton v. State*, 167 N.E.3d 800, 801 (Ind. Ct. App. 2021) (quoting *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007)).

[27] To obtain a conviction for murder, the State was required to prove that Pritcher knowingly or intentionally killed L.P. "A person knowingly kills when they are 'aware of a high probability' that their actions may kill." *Leonard*, 80 N.E.3d at 882 (quoting I.C. § 35-41-2-2(b)). "Knowledge and intent are both mental states and, absent an admission by the defendant, the jury must resort to the reasonable inferences from both the direct and circumstantial evidence to

determine whether the defendant has the requisite knowledge or intent to commit the offense in question." *Stubbers v. State*, 190 N.E.3d 424, 432 (Ind. Ct. App. 2022), *trans. denied*; *see also Leonard*, 80 N.E.3d at 883 ("Because knowledge is the mental state of the actor, the trier of fact must resort to reasonable inferences of its existence."). "In deciding whether a defendant was aware of the high probability that his actions would result in the death of a victim, the jury may consider the duration and brutality of a defendant's actions, and the relative strengths and sizes of a defendant and victim." *Williams v. State*, 749 N.E.2d 1139, 1141 (Ind. 2001) (citing *Childers v. State*, 719 N.E.2d 1227, 1229 (Ind. 1999)).

[28] Pritcher acknowledges that there was sufficient evidence to prove that he struck L.P. on the head and that L.P. died as a result of injuries to his head. Pritcher argues, however, that the State failed to prove that Pritcher **knowingly** killed L.P. Specifically, he contends that the State argued and proved only that, when Pritcher beat L.P., he **could**[2] cause L.P.'s death. In so arguing, Pritcher refers

---

[2] Pritcher briefly argues that the prosecutor also misstated the law by arguing that, to knowingly kill L.P., Pritcher had to be aware that his actions "could" result in L.P.'s death, as opposed to "would" result in his death. Our Supreme Court rejected a similar argument in *Ramirez v. State*, 174 N.E.3d 181 (Ind. 2021). In *Ramirez*, the trial court used the word "could" instead of "would" when giving a supplemental instruction to the jury regarding the "knowingly" *mens rea* in a murder case. The Court held that this was not a misstatement of the law, noting that the trial court's instruction was "prefaced by requiring that the jury must find the defendant was aware of '**a high probability** that said injury could cause the death of the other person.'" *Id*. at 199 (emphasis added). Accordingly, the Court held that, "the instruction's use of the phrase 'high probability' clearly told the jury that a probability—not a possibility—was required." *Id*. The Court further noted that "appellate courts have used 'could' instead of 'would' when describing the level of culpability required to find that a defendant 'knowingly' killed a victim." *Id*. (citing *Jones v. State*, 689 N.E.2d 722, 725 (Ind. 1997)). Again, here, any error in the use of the word "could" was during the State's closing argument, not the trial court's instructions, which properly defined the "knowingly" *mens rea*. Given the holding in *Ramirez*, Pritcher's argument regarding the prosecutor's use of the word "could" is unavailing.

again to the prosecutor's misstatement of the law in its rebuttal argument. The State counters that the facts viewed in the light most favorable to the jury's verdict are sufficient to prove that Pritcher knowingly killed L.P.

[29] We conclude that the State presented sufficient evidence to support Pritcher's conviction. Pritcher was alone with L.P. when the boy's injuries were inflicted; thus, there is no question about whether another caretaker inflicted the injuries. Pritcher claims that many of L.P.'s injuries could have been self-inflicted. The only evidence, however, supporting this theory is Pritcher's own self-serving testimony, which the jury was free to discredit. Moreover, the forensic pathologist who testified at trial explicitly explained that L.P.'s injuries could not have been self-inflicted. Indeed, there was testimony that L.P.'s injuries were caused by repeated, forceful blows to the boy's head. When speaking with the police, Pritcher also admitted to "beat[ing]" and "whipp[ing] [L.P.'s] ass." Tr. Vol. III p. 78.

[30] In spite of all of this evidence, Pritcher argues that he did not "knowingly" kill L.P. Pritcher, however, was a full-grown man who stood 6' 2" tall and weighed over 240 pounds. L.P., in contrast, was 4' 5" tall and weighed just seventy-seven pounds. Pritcher's beatings also inflicted horrific injuries on L.P., who had bruises all over his body, in addition to severe bleeding in his brain.

[31] In cases involving adults beating small children, the requisite intent to kill may be "inferred from repeated severe blows to a child where anyone with reasonable judgment would know that blows of such magnitude could fatally

injure the child." *Anderson v. State*, 466 N.E.2d 27, 30 (Ind. 1984). Given the nature and severity of L.P.'s injuries, sufficient evidence was presented from which the jury could reasonably conclude that Pritcher was aware of a high probability that his actions of beating L.P. might kill the boy. *See Burns v. State*, 59 N.E.3d 323, 328 (Ind. Ct. App. 2016) ("[W]here blows of magnitude are repeated, a jury [can] conclude that the defendant had an intent to kill.") (citing *Nunn v. State*, 601 N.E.2d 334, 339 (Ind. 1992)).

### III. *Appropriateness of Pritcher's Sentence*

[32]     The trial court entered judgment of conviction only on the murder verdict and sentenced Pritcher to the maximum sixty-five year sentence. Pritcher argues that this sentence is inappropriate. The Indiana Constitution authorizes independent appellate review and revision of a trial court's sentencing decision. *See* Ind. Const. art. 7, §§ 4, 6; *Jackson v. State*, 145 N.E.3d 783, 784 (Ind. 2020). Our Supreme Court has implemented this authority through Indiana Appellate Rule 7(B), which allows this Court to revise a sentence when it is "inappropriate in light of the nature of the offense and the character of the offender." Our review of a sentence under Appellate Rule 7(B) is not an act of second guessing the trial court's sentence; rather, "[o]ur posture on appeal is [ ] deferential" to the trial court. *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016) (citing *Rice v. State*, 6 N.E.3d 940, 946 (Ind. 2014)). We exercise our authority under Appellate Rule 7(B) only in "exceptional cases, and its exercise 'boils down to our collective sense of what is appropriate.'" *Mullins v. State*, 148

N.E.3d 986, 987 (Ind. 2020) (per curiam) (quoting *Faith v. State*, 131 N.E.3d 158, 160 (Ind. 2019)).

[33] The principal role of appellate review of sentences is "to attempt to 'leaven the outliers.'" *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020) (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)). The point is "not to achieve a perceived correct sentence." *Id*. "Whether a sentence should be deemed inappropriate 'turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case.'" *Id*. (quoting *Cardwell*, 895 N.E.2d at 1224). When determining whether a sentence is inappropriate, the advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Fuller v. State*, 9 N.E.3d 653, 657 (Ind. 2014).

[34] Pritcher received the maximum sentence for murder. *See* Ind. Code § 35-50-2-3(a). "The Indiana Supreme Court has noted that 'the maximum possible sentences are generally most appropriate for the worst offenders.'" *Martin v. State*, 179 N.E.3d 1060, 1071 (Ind. Ct. App. 2021) (quoting *Buchanan v. State*, 767 N.E.2d 967, 973 (Ind. 2002)), *trans. denied*.

> This is not, however, a guideline to determine whether a worse offender could be imagined. Despite the nature of any particular offense and offender, it will always be possible to identify or hypothesize a significantly more despicable scenario. Although maximum sentences are ordinarily appropriate for the worst offenders, we refer generally to the class of offenses and offenders that warrant the maximum punishment. But such class encompasses a considerable variety of offenses and offenders.

*Id.* (quoting *Buchanan*, 767 N.E.2d at 973).

### A. Nature of the Offense

[35]     Our analysis of the "nature of the offense" requires us to look at the nature, extent, heinousness, and brutality of the offense. *See Brown v. State*, 10 N.E.3d 1, 5 (Ind. 2014). Deference to the trial court's sentence "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as [being] accompanied by restraint, regard, and lack of brutality)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). We may also consider whether the offender "was in a position of trust" with the victim. *Pierce v. State*, 949 N.E.2d 349, 352 (Ind. 2011).

[36]     In the present case, Pritcher acknowledges that the killing of a child is always an egregious offense, but he repeats his claim that there was no evidence that he knowingly killed L.P. This merely restates his sufficiency-of-the-evidence argument, which we have rejected above. We can find no compelling evidence that would portray the nature of Pritcher's offense in a positive light. Pritcher savagely beat his own seven-year-old son and inflicted numerous, horrific injuries that resulted in the young child's untimely death. The photos of L.P.'s severe injuries, which were admitted into evidence and included in the record, are difficult to look at, even for those who are accustomed to seeing photos of murder victims. Pritcher showed no restraint, regard, or lack of brutality while beating his son to death. We also cannot overlook the position of trust that Pritcher was in as L.P.'s father. Pritcher was the sole physical custodian of his own son and abused this position of trust in one of the most unspeakable ways

imaginable. The nature of Pritcher's offense in no way suggests that Pritcher's maximum sixty-five year sentence is inappropriate.

### B. Character of the Offender.

[37] Our analysis of the character of the offender involves a broad consideration of a defendant's qualities, including the defendant's age, criminal history, background, past rehabilitative efforts, and remorse. *Harris v. State*, 165 N.E.3d 91, 100 (Ind. 2021). The significance of a criminal history in assessing a defendant's character and an appropriate sentence varies based on the gravity, nature, proximity, and number of prior offenses in relation to the current offense. *Pierce,* 949 N.E.2d at 352-53. "Even a minor criminal history is a poor reflection of a defendant's character." *Prince v. State*, 148 N.E.3d 1171, 1174 (Ind. Ct. App. 2020) (citing *Moss v. State*, 13 N.E.3d 440, 448 (Ind. Ct. App. 2014), *trans. denied*). Again, deference to the trial court's sentence "should prevail unless overcome by compelling evidence portraying in a positive light . . . the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson*, 29 N.E.3d at 122.

[38] Pritcher notes that he has only one adult criminal conviction, for the minor offense of underage consumption of alcohol. But his juvenile history for sexual battery and criminal confinement reflects poorly on his character. During the sentencing hearing, moreover, L.P.'s mother, Layton, testified that the only point during the trial in which Pritcher showed any emotion was when Pritcher's ex-girlfriend, Mize, showed up to the trial accompanied by another man. And Mize testified that Pritcher physically abused her during their

relationship by punching and choking her on several occasions. Pritcher's poor character was further evidenced when Pritcher chose to call and text Mize instead of immediately calling 911, which, as the trial court noted, showed a "shocking disregard for the life and health of his child." Appellant's App. Vol. II p. 247.

[39] Although Pritcher argues that his gainful employment reflects well on his character, we have long held that most people are gainfully employed, and this does not weigh in favor of a lesser sentence. *Hale v. State*, 128 N.E.3d 456, 465 (Ind. Ct. App. 2019) (citing *Holmes v. State*, 86 N.E.3d 394, 399 (Ind. Ct. App. 2017), *trans. denied*). Considering the brutal and heinous nature of Pritcher's offense and his lack of good character, and giving due deference to the trial court's sentencing decision, we cannot say that Pritcher's sixty-five year sentence for the beating death of his seven-year-old son is inappropriate.

## Conclusion

[40] The prosecutor's misstatement of the law during closing argument did not constitute fundamental error because the trial court properly instructed the jury regarding the elements of murder and the correct definition of the requisite *mens rea* of knowingly. The State presented sufficient evidence to support Pritcher's conviction, and Pritcher's sixty-five year sentence is not inappropriate. Accordingly, we affirm Pritcher's conviction and sentence.

[41] Affirmed.

Vaidik, J., and Weissmann, J., concur.