

**FILED**

Jan 24 2024, 8:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Zachariah David Konkle,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

January 24, 2024

Court of Appeals Case No.
23A-CR-783

Appeal from the
Jackson Circuit Court

The Honorable
Richard W. Poynter, Judge

Trial Court Cause No.
36C01-2108-MR-1

**Opinion by Judge Vaidik**
Judge Brown concurs.
Judge Bradford dissents with separate opinion.

**Vaidik, Judge.**

# Case Summary

[1] To convict a defendant of murder or voluntary manslaughter, it is a basic tenet of criminal law that the State must prove that the killing was done "knowingly." A person engages in conduct "knowingly" if, when they engage in the conduct, they are aware of a high probability that they are doing so.

[2] Zachariah David Konkle fought Michael Steele, and Steele died. Before the fight, Steele had an enlarged heart, 90% occlusion of his coronary arteries, and a history of prior heart attacks. Konkle did not know about Steele's heart problems, yet the State charged him with murder. During trial, the sole issue was whether Konkle knowingly killed Steele, as the State conceded that the killing was not intentional. The State's position was that Steele died because of asphyxiation caused by Konkle placing Steele in a headlock or lying on his chest and thus he was guilty of knowingly killing Steele. Konkle argued that Steele would not have died but for his preexisting heart problems of which he was unaware. Thus, he argued that he was guilty of a lesser-included offense, either reckless homicide or involuntary manslaughter, neither of which requires a knowing killing. There was evidence from pathologists and eyewitnesses supporting both the State's and the defense's theories.

[3] During closing argument, the State, for the first time, contended the "eggshell victim rule" applied, which relieved the State of proving that Konkle knowingly

killed Steele. The State argued that the eggshell-victim doctrine provides that the defendant takes the victim as they find them and that "if one throws a piece of chalk at a victim with an eggshell skull and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty even if he didn't intend to bring bodily harm." The jury found Konkle guilty of the lesser-included offense of voluntary manslaughter.

[4] Because the issue was whether Konkle knowingly killed Steele and there was credible evidence supporting both theories, we find the prosecutor's statement constituted misconduct and fundamental error. We reverse Konkle's conviction and remand for a new trial.

## Facts and Procedural History

[5] On July 27, 2021, forty-two-year-old Steele and thirty-two-year-old Konkle were working at the Jackson County Fair in Brownstown. That night, a mother and a father attended the fair with their three daughters. When one of their daughters, who has "multiple mental and behavioral issues," threw a tantrum after losing the goldfish game, a worker made fun of her. Tr. Vol. II p. 234. The mother went to look for a supervisor to make a complaint about the worker. Konkle approached the mother and told her he "would take care of it." *Id.* at 235. The family then went home.

[6] Later that night, Konkle told some fellow workers that "somebody [had been] messing with a mentally handicapped child" and that "if he found the person . .

. he was going to hurt them." Tr. Vol. III pp. 18-19. The workers told Konkle not to take matters into his owns hands and to let management handle it. Konkle did not take their advice. At first, Konkle believed that Robert Clark was the worker who had made fun of the girl, so Konkle attacked Clark. Clark, however, was the wrong person.

[7] Konkle later encountered Steele and told him that if he found out "he hit the wrong person the first time the second one was going to get it twice as worse." Tr. Vol. II pp. 244-45. Unknown to Konkle, however, Steele had several heart problems, including significantly blocked coronary arteries and an enlarged heart. Steele, who appeared "intimidated" by Konkle, eventually "got tired of hearing it" from Konkle and said, "let's go." *Id.* at 245, 250. Steele threw the first punch, following which both men exchanged punches. Both men ended up on the ground. Steele had his face "in the ground," and Konkle's chest was on Steele's head. *Id.* at 250; Tr. Vol. III p. 11. It "looked like" Konkle's arms were "around" Steele's neck. Tr. Vol. III p. 4; *see also* Tr. Vol. II p. 245 ("[Y]ou really couldn't see [Konkle's] arms where they were located so I really can't say he was choking [Steele] because I don't know."); Tr. Vol. III p. 132 (testifying that Konkle's arm was around Steele's neck as they fell to the ground). Konkle hit Steele five or six times in the back of the head and said, "[G]o to sleep bit**." Tr. Vol. II p. 246; Tr. Vol. III p. 11. Steele then started making gurgling sounds. At that point, Konkle got off Steele, as it appeared that Konkle didn't "mean[]" for "anything like that" to happen. Tr. Vol. II p. 247. Another worker started CPR, and Konkle joined in.

Konkle asked those who were present to tell law enforcement that Steele had fallen in the shower. Law enforcement was summoned from the other side of the fairgrounds and took over CPR until EMS arrived. Konkle was interviewed on the scene and then again at the police department. On the scene, Konkle said he was mad at Steele for making fun of the special-needs girl because he has a special-needs child. Ex. 5. He explained that Steele punched him in the head, he punched Steele back, they both went to the ground, and he put his arms around Steele and laid on him to calm him down. *Id.* He said that when Steele started gasping for air, bystanders told him to let go and that Steele had heart issues. *Id.*

Steele was taken to IU Methodist Hospital in Indianapolis, where he died. Dr. Bruce Wainer, a forensic pathologist at the Marion County Coroner's Office, performed the autopsy. He concluded that Steele's cause of death was "[m]echanical asphyxiation complicating compression of the carotid artery through a 'choke hold.'" Ex. 31. The autopsy report also noted Steele's heart problems.

The State charged Konkle with murder. A jury trial was held in February 2023. The key issue at trial was whether Konkle knowingly killed Steele, as the State conceded that Konkle did not intentionally kill Steele. Dr. Wainer was no longer employed at the Marion County Coroner's Office, so Dr. Christopher Poulos, the chief forensic pathologist at the office, testified instead. He largely agreed with the two causes of death that Dr. Wainer identified in the autopsy

report.[1] First, Dr. Poulos found that Steele's brain was not functioning properly from lack of blood flow due to "mechanical asphyxiation," that is, outside compression of the body that results in the inability to transmit oxygen to the brain. Tr. Vol. III p. 81. Dr. Poulos said the asphyxia could have been from a chokehold, which Dr. Wainer based his cause of death on, or compression of Steele's chest, which witnesses testified to at trial. Dr. Poulos acknowledged that there were no injuries to Steele's neck (externally or internally). *Id.* at 107.

[11] Second, Dr. Poulos found that Steele had "bilateral conjunctival petechial hemorrhages consistent with repetitive compression of the carotid arteries." *Id.* at 81. Dr. Poulos acknowledged that petechiae have several other causes, including heart disease, and that Steele's cardiovascular system was in "poor" health. *Id.* at 83, 104. Steele's heart was enlarged and his coronary arteries were "narrowed by 90 percent," which constituted "critical stenosis" and had the potential, on its own, to cause death. *Id.* at 84. His heart also showed signs of "previous heart attacks," one of which was recent. *Id.* Dr. Poulos said it was "[q]uite possible" that Steele had a heart attack during the fight with Konkle. *Id.* at 85. Dr. Poulos maintained that Steele did not die from natural causes but rather "homicide," that is, death "at the hands of another." *Id.* at 110. He

---

[1] Dr. Poulos testified that he didn't agree with Dr. Wainer's phrasing of the cause of death and said that he would phrase it as "mechanical asphyxiation and compression of the carotid arteries." *See* Tr. Vol. III pp. 82, 102, 103.

concluded his testimony by saying that "if just the struggle caused a heart attack [he] would still call it a homicide." *Id.* at 113.

[12] Another forensic pathologist, Dr. George Nichols, II, testified for the defense that Steele died from natural causes, specifically, a "terribly diseased heart" and heart attack. *Id.* at 232. Dr. Nichols pointed out that there were no injuries to Steele's neck and that he had only minor injuries, such as scratches and bruises. In short, Dr. Nichols said that Steele had no injuries "that would have prevented him from walking away had he not ceased activity of his heart." *Id.*

[13] Following the close of the evidence, the jury was instructed on murder (knowing or intentional killing) as well as Level 2 felony voluntary manslaughter (knowing or intentional killing under sudden heat), Level 5 felony reckless homicide (reckless killing), and Level 5 felony involuntary manslaughter (killing while committing or attempting to commit battery). The jury was also instructed on the definition of "knowingly":

> A person engages in conduct "knowingly" if, when he engages in this conduct, he is aware of a high probability that he is doing so. If a person is charged with knowingly causing a result by his conduct, the State is required to prove beyond a reasonable doubt that he must have been aware of a high probability that his conduct would cause the result.

Appellant's App. Vol. II p. 130.

[14] During closing argument, the State argued that Konkle acted knowingly and asked the jury to find him guilty of murder. The State told the jury that because

Konkle "seriously injure[d]" Steele, he was aware of a high probability that Steele could die. Tr. Vol. IV p. 18. The State then argued, for the first time, that the "eggshell victim rule" applied[2]:

> [The State:] . . . There's a principle of the law called the eggshell victim rule, sometimes called the eggshell plaintiff rule, sometimes called the eggshell skull rule. A longstanding rule I mean read it literally because this – I didn't type this up. A longstanding rule of criminal law and tort, that's civil law, that a defendant takes his victim as he finds him. And this is where the phrase goes, if one throws a piece of chalk at a victim with an eggshell skull and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty even if he didn't intend to bring bodily harm.
>
> That's essentially saying if somebody picks on somebody who for one reason or another, health, age, is weak, as a perpetrator you don't get a bonus for picking on a weakling. Does that make sense? Next slide please. A defendant is liable for aggravation or exacerbation of a current injury. Somebody has a heart condition and you cause them to have a heart condition you're liable for that. Again, I'm not making this up. Indiana Supreme Court law from 10-11 years ago.
>
> [Defense counsel:] Your honor I'm going to object. May we approach.
>
> [Trial court:] Counsel, the objection's overruled.

---

[2] Based on comments made during closing argument, it appears that the State used a PowerPoint presentation and that there was a slide for the eggshell-victim doctrine. *See, e.g.*, Tr. Vol. IV pp. 27-28 (prosecutor telling co-counsel "Next" and "Next slide please").

[The State:] The victim may have a greater sensitivity to pain, they are no less victims. Our law in many aspects tries to protect those who are weaker. The defense wants you to believe it's the other way around. That it's Mr. Steele's fault that he's dead. No. Zachariah Konkle just happened to attack somebody and try to put to sleep somebody who had another condition.

*Id.* at 27-28.[3] Defense counsel argued that Konkle did not kill Steele knowingly and asked the jury to find him guilty of either reckless homicide or involuntary manslaughter. The jury found Konkle guilty of Level 2 felony voluntary manslaughter. Konkle then admitted being a habitual offender. The court sentenced Konkle to twenty-four years for voluntary manslaughter enhanced by ten years for being a habitual offender, for a total of thirty-four years.

[15] Konkle now appeals.[4]

# Discussion and Decision

[16] Konkle contends the State committed prosecutorial misconduct during closing argument when it "told the jury that the Indiana Supreme Court, under the eggshell skull doctrine, has allowed people to be convicted even if they did not intend the harm the victim sustained."[5] Appellant's Br. p. 10. Konkle argues the

---

[3] The trial court did not give—and we see no indication that the State requested—an instruction on the eggshell-victim doctrine.

[4] We held oral argument on December 11, 2023. We thank counsel for their helpful advocacy.

[5] Konkle raises other issues on appeal, but given our resolution of this issue, we need not address them.

doctrine does not apply to murder and voluntary-manslaughter cases and that therefore this was a misstatement of the law.

[17] "In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (quotation omitted). "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct." *Id.* The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.* "To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial." *Id.*

## I. Konkle waived his prosecutorial-misconduct argument

[18] The State says Konkle waived this issue because he didn't "request an admonishment or mistrial when his objection was overruled." Appellee's Br. p. 21. As referenced above, although defense counsel objected during the State's closing and asked to approach the bench, he did not request an admonishment or move for a mistrial. Konkle argues that doing these things would have been futile given that the trial court had just overruled his objection and rejected his request to approach the bench. But under the Indiana Supreme Court's

authority, this still constitutes waiver. *See Wright v. State*, 690 N.E.2d 1098, 1111 (Ind. 1997) ("Failure to request an admonishment or move for a mistrial results in waiver of the issue. Generally this is so, even if the court has overruled a timely objection." (citations omitted)); *see also Flowers v. State*, 738 N.E.2d 1051, 1058-59 (Ind. 2000) ("To preserve an issue regarding the propriety of a closing argument for appeal, a defendant must do more than simply make a prompt objection to the argument. Defendant must also request an admonishment, and if further relief is desired, defendant must move for a mistrial."), *reh'g denied.* At oral argument, Konkle acknowledged this authority but argued that it should be reconsidered. We understand the difficult position defense counsel was in even objecting during closing let alone having the court sustain the objection and deny his request to approach the bench. Even so, we cannot overrule Supreme Court precedent. Given this precedent, defense counsel should have asked the court if he could make a record. If counsel was denied the opportunity during closing to make a record, then immediately after the jury left the courtroom, he should have asked for an admonishment to the jury and moved for a mistrial. Because Konkle didn't do so, he has waived the issue, and he must establish not only the grounds for prosecutorial misconduct but also that the prosecutorial misconduct constituted fundamental error. *Ryan*, 9 N.E.3d at 667-68.

## II. The State's comments during closing constitute fundamental error

[19]    "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so

prejudicial to the defendant's rights as to make a fair trial impossible." *Id.* at 668. To establish fundamental error, the defendant must show that the alleged error constituted a clearly blatant violation of basic and elementary principles of due process and presented an undeniable and substantial potential for harm. *Id.*

[20] Konkle claims the State misstated the law when it said the eggshell-victim doctrine applied, which constitutes misconduct. Misconduct can occur when the prosecutor misstates the law during closing argument. *See Pritcher v. State*, 208 N.E.3d 656, 664 (Ind. Ct. App. 2023). The Indiana Supreme Court case the State referred to during closing is *Bailey v. State*, 979 N.E.2d 133 (Ind. 2012). There, the defendant shoved and poked his wife, causing her pain. He was convicted of domestic battery, which was enhanced from a Class B misdemeanor to a Class A misdemeanor due to "bodily injury."[6] On appeal, the defendant argued the evidence was insufficient to support the bodily injury enhancement. *See* Ind. Code § 35-31.5-2-29 (defining "bodily injury" as "any impairment of physical condition, including physical pain"). The issue before our Supreme Court was whether any level of pain constitutes bodily injury or whether some minimum level is required. Our Supreme Court ultimately concluded that a bright-line test was preferable and that any level of pain constitutes bodily injury. The Court reasoned that holding otherwise could

---

[6] The Class A misdemeanor was enhanced to a Class D felony due to a prior conviction, but the defendant did not challenge that enhancement.

unfairly discount the suffering of certain victims who may have a lower pain tolerance than others, which runs counter to the long-standing rule of both criminal and tort law that a defendant takes his victim as he finds him. *See Defries v. State,* 264 Ind. 233, 244-45, 342 N.E.2d 622, 630 (1976) . . . . Though they may have a greater sensitivity to pain, these individuals are no less victims than someone who may be more tolerant.

*Bailey*, 979 N.E.2d at 142. *Defries*, in turn, is an aggravated-battery case. In that case, our Supreme Court explained that under the aggravated-battery statute in effect then, which required "great bodily harm," the defendant did not have to intend to do great bodily harm to be convicted:

[I]f one throws a piece of chalk at the legendary victim with an eggshell skull, and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty under our statute even though he did not intend to do great bodily harm.

*Defries*, 342 N.E.2d at 630.

[21] These references to the eggshell-victim doctrine in *Bailey* and *Defries* are consistent with the principle that the knowingly or intentionally mens rea does not apply to the severity of an injury under our battery statutes because the severity of an injury is an aggravating factor and **not** an element of conduct. *See Lowden v. State*, 51 N.E.3d 1220, 1223 (Ind. Ct. App. 2016), *trans. denied*. But murder and voluntary-manslaughter cases are different because killing **is** an element of conduct to which the mens rea applies. *See* I.C. § 35-42-1-1 (providing that a person who knowingly or intentionally kills another human being commits murder); I.C. § 35-42-1-3 (providing that a person who

knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter).

[22] Indeed, the State does not cite, nor can we locate, any Indiana cases where the eggshell-victim doctrine was applied to a murder or voluntary-manslaughter case to establish that the defendant knowingly or intentionally killed someone. A search of other jurisdictions doesn't reveal many cases, but those we found support that the eggshell-victim doctrine doesn't apply to murder or voluntary-manslaughter cases. As the Seventh Circuit has explained:

> The eggshell-skull principle does not quite fit a case of intentional murder, for the murderer must intend his victim's death and ordinarily this will presuppose some awareness of the likely consequences of his act. It is not murder to kill a person by a slight blow harmless to an ordinary person if you do not know the person is unusually vulnerable; there is even a presumption in Illinois that one who beats another with his bare fists does not intend to kill him.

*Brackett v. Peters*, 11 F.3d 78, 81-82 (7th Cir. 1993) (citation omitted); *see also State v. O'Bannon*, 274 P.3d 992 (Utah Ct. App. 2012). The State misstated the law during closing, which constitutes misconduct.[7]

[23] The question, then, is whether this misconduct placed Konkle in a position of grave peril and made a fair trial impossible. Konkle claims the misconduct

---

[7] As noted above, it does not appear that the State requested an instruction on the eggshell-victim doctrine. Had it done so, this problem may have been avoided, as the parties and the trial court would have had the opportunity to consider this issue in depth.

placed him in a position of grave peril because it left the jury "with the impression that [he] could be convicted of murder or voluntary manslaughter even if there was no evidence that [he] was aware of a high probability" that his actions would cause Steele's death. Appellant's Br. p. 17. On this record, we agree with Konkle.

[24] The only issue for the jury to decide was whether Konkle was aware of a high probability that his actions would cause Steele's death. It was undisputed that forty-two-year-old Steele had almost completely blocked coronary arteries that put him at risk of death, that he had prior heart attacks, that he likely suffered a heart attack during the fight, and that Konkle knew none of this. Konkle's forensic pathologist testified that Steele died from a "terribly diseased heart" and heart attack. He explained that Steele had only scratches and bruises and that nothing would have prevented him from walking away from the fight had he not had a heart attack. The State's forensic pathologist found that Steele died from mechanical asphyxiation and compression of the carotid arteries (either from a chokehold or compression of his chest) and concluded his testimony by saying that "if just the struggle caused a heart attack [he] would still call it a homicide."

[25] During closing, the State acknowledged it had to prove that Konkle acted knowingly to obtain a guilty verdict for murder. But then things started to go off the rails. First, the State told the jury that because Konkle seriously injured Steele, he knowingly killed him. That, however, is not the law. Instead, the

State had to prove that Konkle was aware of a high probability that his conduct would **kill** Steele. *See Pritcher*, 208 N.E.3d at 664.

[26] To make matters worse, the State then argued that the inapplicable eggshell-victim doctrine applied, telling the jury that because Steele had preexisting heart problems, Konkle was guilty of a knowing killing "even if he didn't intend to bring bodily harm." The State tried to bolster this argument by emphasizing that the Indiana Supreme Court had established this rule a decade earlier. But as already explained, that is simply not the case. Defense counsel objected, but the trial court, in the presence of the jury, overruled his objection and prohibited him from approaching the bench. This reinforced the State's argument that the eggshell-victim doctrine applied. Given the conflicting evidence, it is entirely possible that the jury concluded that Steele wouldn't have died but for his preexisting heart problems. If that happened, the State's misconduct was probably the deciding factor in the case.

[27] At oral argument, the State, citing *Pritcher*, argued there is no fundamental error. In *Pritcher*, the defendant, who was 6'2" and weighed over 240 pounds, beat his seven-year-old son, L.P., who weighed seventy-seven pounds. L.P., who was covered in bruises from head to toe, died from blunt-force injuries to his head, and the defendant was charged with murder. During closing, defense counsel argued that the defendant did not "knowingly" kill L.P. In rebuttal, the State claimed the jury need only find that the defendant was aware of a high probability that he was beating L.P., not that he was aware of a high probability that he would kill L.P. The defendant did not object, and the jury found him

guilty of murder. On appeal, we found that the State's comments constituted misconduct but not fundamental error because the trial court's instruction defining "knowingly" cured the State's misstatement of the law. *Id.* at 665. Here, although the trial court also instructed the jury on the definition of "knowingly," that did not cure the State's misstatement of the law that the eggshell-victim doctrine applied.

[28] The State's prosecutorial misconduct made a fair trial impossible and constitutes fundamental error. We therefore reverse Konkle's conviction for voluntary manslaughter and remand for a new trial.[8]

[29] Reversed and remanded.

Brown, J, concurs.

Bradford, J., dissents with separate opinion.

---

[8] Because there is sufficient evidence to support Konkle's conviction, double jeopardy does not bar retrial. *See Yeary v. State*, 186 N.E.3d 662, 681-82 (Ind. Ct. App. 2022).

**Bradford, J., dissents with opinion.**

[30] Because I disagree with the majority's conclusion that Konkle was denied a fair trial due to fundamental error, I respectfully dissent. In order to adequately explain my position, I feel it necessary to relate some additional facts.

[31] On the evening of July 27, 2021, Shelby Vance was at the Jackson County Fair with, among others, her special-needs, seven-year-old daughter. When Vance heard that a worker at one of the carnival games had been making fun of her daughter, she reported the incident to Konkle, who told Vance that "he would take care of it[.]" Tr. Vol. II p. 235. Konkle, who worked for Poor Jack Amusements, told fellow employee Christopher Gartrell that he had become aware of "somebody messing with a mentally handicapped child" and "[t]hat if he found the person he was going to hurt him." Tr. Vol. III pp. 18, 19. Soon thereafter, Konkle "sucker punched" fellow Poor Jack employee Clark but Clark persuaded Konkle that he was not the person who had been ridiculing Vance's daughter. Tr. Vol. III p. 199.

[32] Around 1:00 a.m. the next morning, Poor Jack employee Matthew Walker heard a commotion outside of his sleeping quarters and emerged to find Konkle confronting Steele, telling him "[t]hat if [he] found out he hit the wrong person the first time the second one was going to get it twice as worse." Tr. Vol. II p. 244–45. Steele, apparently tired of "hearing it," turned and threw the first punch. Tr. Vol. II p. 245. After the exchange of a few blows, Konkle managed to get Steele face down on the ground, with his arms "up underneath [Steele's] head [….] look[ing] like they around his neck" and his chest on the back of

Steele's head, where he punched him five times in the back of the head and told him to "go to sleep b[****.]" Tr. Vol. II pp. 246, 250; Vol. III p. 4. Brittany Fry later testified that she had left her sleeping quarters and had seen Konkle holding Steele in a "headlock position" as they "were on their way to the ground[.]" Tr. Vol. III p. 132. Steele began to gurgle, convulse, and foam at the mouth and died on July 31, 2021, never having regained consciousness. After Steele was taken away in an ambulance, Konkle unsuccessfully attempted to persuade multiple persons to tell authorities that Steele had fallen in the shower. While the police were still on the scene investigating the incident, Konkle and his wife attempted to drive away from the fairgrounds but were prevented by Konkle's employer, who stood in front of the vehicle and removed the keys from its ignition.

[33] The State charged Konkle with murder and alleged that he was a habitual offender. The trial court delivered preliminary instructions at Konkle's jury trial, which included the following:

- "The case was started when an Information was filed charging the Defendant with Murder, a felony. That Information, omitting formal parts reads: The undersigned says that on or about July 28, 2021 in Jackson County, State of Indiana, Zachariah David Konkle, *did knowingly or intentionally kill another human* being, to wit: Michael Steele, contrary to the form of the statutes in such cases made and provided by I.C. 35-42-1-1(1) and against the peace and dignity of the State of Indiana." Tr. Vol. II pp. 166–67 (emphasis added).

- "To overcome the presumption of innocence, the State must prove the Defendant guilty of *each element of the crime*

*charged*, beyond reasonable doubt." Tr. Vol. II p. 167 (emphasis added).

- "You are the exclusive judges of the evidence, *which may be either witness testimony or exhibits*." Tr. Vol. II p. 168 (emphasis added).

- "The Court's instructions are your best source in determining the law." Tr. Vol. II p. 168.

- "When the evidence is completed, the attorneys may make final arguments. *These final arguments are not evidence*." Tr. Vol. II p. 170 (emphasis added).

[34] The State called Marion County Chief Forensic Pathologist Dr. Christopher Poulos as a witness. Dr. Poulos testified that, while Dr. Bruce Wainer had performed the autopsy on Steele, he had formed an independent opinion regarding Steele's case. Dr. Poulos nonetheless agreed with Dr. Wainer's conclusion that Steele's brain had ceased to function properly due to a lack of blood flow caused by mechanical asphyxiation. This conclusion was based on the fact that Steele had had conjunctival petechial hemorrhages in both eyes, injuries consistent with somebody compressing the neck or other parts of the body, impairing blood flow to the brain. Dr. Poulos concluded that the compression in Steele's case had led to "the death of the brain due to lack of blood flow and lack of oxygenation." Tr. Vol. III p. 82. Dr. Poulos, however, indicated that in cases of chokehold "like the carotid sleeper hold, there will not necessarily be evidence of external injury to the neck." Tr. Vol. III p. 96.

[35] Forensic pathologist Dr. George Nichols, II, testified as the sole witness in Konkle's case-in-chief. Dr. Nichols opined that the manner of Steele's death had been natural, not homicide. Dr. Nichols testified to his opinion that

Steele's body had produced "relatively massive amounts of epinephrine" during his fight with Konkle, causing his heart rate and blood pressure to rise and triggering a fatal heart attack. Tr. Vol. III p. 242. On cross-examination, however, Dr. Nichols acknowledged that, before taking the stand, he had been unaware of evidence regarding Konkle's arm having been around Steele's neck. Dr. Nichols agreed that his previous understanding of what had occurred "may not be entirely accurate" and that one person intentionally making another person lose consciousness could be deadly. Tr. Vol. III p. 250.

[36] During closing, the prosecutor began by conceding that Konkle had not intentionally killed Steele, arguing only that he had knowingly done so:

> This is a knowing murder. State of mind. You as the jury have to figure out what is in the defendant's mind. Conduct which is knowingly is done if when he personally engaged in conduct, *engaged in a conduct he's aware of a high probability that he is doing so*.

Tr. Vol. IV p. 18 (emphasis added).

[37] The prosecutor later made the following statement:

> There's a principle of the law called the eggshell victim rule, sometimes called the eggshell plaintiff rule, sometimes called the eggshell skull rule. A longstanding rule I mean read it literally because this—I didn't type this up. A longstanding rule of criminal law and tort, that's civil law, that a defendant takes his victim as he finds him. And this is where the phrase goes, if one throws a piece of chalk at a victim with an eggshell skull and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty even if he didn't intend to bring bodily harm. That's essentially saying if somebody picks on somebody who for one reason or another, health, age, is weak, as a perpetrator you don't get a bonus for picking on a weakling. Does that make

sense?  Next slide please.  A defendant is liable for aggravation or exacerbation of a current injury.  Somebody has a heart condition and you cause them to have a heart condition you're liable for that.  Again, I'm not making this up.  Indiana Supreme Court law from 10–11 years ago.

Tr. Vol. IV p. 27–28.  Konkle objected on unknown grounds at this point, which objection was overruled.

[38]    The trial court's final instructions included the following:

- "Included in the charge of Murder is the crime of Voluntary Manslaughter that is defined by law, in part, as follows, a person who *knowingly or intentionally* kills another human being while acting under sudden heat commits Voluntary Manslaughter, a Level Two (2) felony."  Tr. Vol. IV p. 41–42 (emphasis added).

- "If the State did prove beyond reasonable doubt that the Defendant *knowingly or intentionally* killed Michael Steele, but the State failed to prove beyond reasonable doubt that the Defendant was not acting under sudden heat, you may find the Defendant guilty of Voluntary Manslaughter, a Level 2 felony."  Tr. Vol. IV p. 42 (emphasis added).

- "A person engages in conduct knowingly if, when he engages in this conduct, he is aware of a high probability that he is doing so. If a person is charged with knowingly causing result by his conduct, the State is required to prove beyond reasonable doubt that he must have been aware of high probability that his conduct would cause the result."  Tr. Vol. IV p. 43.

- "The Court's instructions are your best source in determining the law."  Tr. Vol. IV pp. 45–46.

The jury found Konkle guilty of voluntary manslaughter, he admitted to being a habitual offender, and the trial court sentenced him to an aggregate term of thirty-four years of incarceration.

# I. Prosecutorial Misconduct as Fundamental Error

[39] Konkle contends that the prosecutor committed misconduct by arguing that the eggshell-skull doctrine applied in this case, warranting a reversal of his conviction. While Konkle seems to contend that he properly preserved this issue in the trial court, the record does not support that contention, indicating neither the ground for his objection to the prosecutor's statements regarding the eggshell-skull doctrine nor that he requested an admonishment. "To preserve an issue regarding the propriety of a closing argument for appeal, a defendant must do more than simply make a prompt objection to the argument. Defendant must also request an admonishment, and if further relief is desired, defendant must move for a mistrial." *Wright v. State*, 690 N.E.2d 1098, 1111 (Ind. 1997). Failure to request an admonishment results in waiver of the issue for appellate review. *Phillips v. State*, 719 N.E.2d 809, 811 (Ind. 1999).

[40] The only way for Konkle to avoid the effects his waiver would be to establish that fundamental error occurred. "The fundamental error exception is 'extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process.'" *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010) (quoting *Matthews v. State*, 849 N.E.2d

578, 587 (Ind. 2006)). To be fundamental, the error "must either 'make a fair trial impossible' or constitute 'clearly blatant violations of basic and elementary principles of due process.'" *Id.* (quoting *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009)). The exception applies "only in 'egregious circumstances.'" *Id.* at 694–95 (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)). I would conclude, however, that Konkle has failed to make a cogent argument regarding fundamental error on appeal, citing a definition of fundamental error but failing to explain how the prosecutor's statement made a fair trial impossible. Failure to make a cogent argument or cite legal authority or the record as required by Indiana Appellate Rule 46(A)(8) waives the issue for appeal. *Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015). While I would stop here, I cannot agree that anything like fundamental error occurred in this case.

## A.   Prosecutorial Misconduct

[41]   As an initial matter, although the issue is not squarely before us, I am inclined to agree with the proposition that the eggshell-skull doctrine does not apply in cases of murder or voluntary manslaughter. The relevant statutes require that the defendant either has to intend to kill the victim or know that his actions will likely result in the victim's death, which is inconsistent with the proposition that you take your victim as you find him. That said, I cannot agree that any misconduct occurred in this case, because, at the time the prosecutor made his comments regarding the eggshell-skull doctrine, they were 100% consistent with Indiana Supreme Court precedent on the matter.

[42]     As it happens, the phrase "eggshell skull" appears in the Indiana criminal reports a grand total of three times, most recently in 2012:

> First, it could unfairly discount the suffering of certain victims who may have a lower pain tolerance than others, *which runs counter to the long-standing rule of both criminal and tort law that a defendant takes his victim as he finds him*. *See Defries v. State*, 264 Ind. 233, 244–45, 342 N.E.2d 622, 630 (1976) ("On the other hand, if one throws a piece of chalk at the legendary victim with an eggshell skull, and the chalk strikes the victim and fractures his skull, the perpetrator would be guilty under our statute even though he did not intend to do great bodily harm."); *cf. Alexander v. Scheid*, 726 N.E.2d 272, 284 (Ind. 2000) (defendant liable for "aggravation or exacerbation of a current injury"). Though they may have a greater sensitivity to pain, these individuals are no less victims than someone who may be more tolerant.

*Bailey v. State*, 979 N.E.2d 133, 142 (Ind. 2012) (emphasis added). Because *Bailey*, as written, stands for the proposition that a defendant takes his victim as he finds him in the criminal law, the prosecutor's statement in this case was 100% consistent with relevant precedent. Under the circumstances, I cannot agree that any prosecutorial misconduct occurred.[9]

[43]     As it is, Konkle claims only that the prosecutor's argument left him in undeserved great peril because "the jury was […] left with the impression that Konkle could be convicted of murder or voluntary manslaughter even if there was no evidence that Konkle was aware of a high probability that Steele would

---

[9] Unless and until the Indiana Supreme Court redefines the doctrine of prosecutorial misconduct, I will continue to assume that claims of prosecutorial misconduct require actual misconduct and not just some sort of mistake (which I also do not think occurred in this case).

die from a heart attack during the fight." Appellant's Br. p. 17. The fatal flaw of this argument is that it is based on the false premise that the State was required to prove that Konkle was aware of a high probability that Steele would die from a heart attack during the fight, which itself is based on the contested assertion that Steele had, in fact, died of a heart attack. All the State was required to prove in this (or any other case involving an allegation of a knowing killing) is that Konkle was aware of high probability that his conduct would cause the result. To that end, the jury heard evidence that Konkle had held Steele in a chokehold as he had said "go to sleep, b[****]" and had *kept* him in a chokehold until he had lost consciousness and had begun to gurgle, convulse, and foam at the mouth. The jury was well within its rights to conclude that Konkle must have been aware that these actions might well kill Steele. So, regarding the only argument the Konkle actually makes, a statement that does no worse than leave the jury with the impression that the defendant can be convicted in the absence of evidence the State is not required to produce is hardly fundamental error.

## B. Fundamental Error

[44] Konkle does not make a separate argument concerning fundamental error or any argument resembling the majority's reasoning. Because that reasoning is the basis for the reversal of Konkle's conviction for voluntary manslaughter, however, I feel it necessary to address it directly. The majority's reasoning appears to go as follows: (1) because Steele's actual cause of death was an underlying heart condition of which Konkle had known nothing, and (2)

because the evidence that Konkle choked Steele was conflicting, and (3) because the jury *could* have concluded that the eggshell-skull doctrine applied to intentional or knowing homicides, and (4) because the jury *could* have believed that Konkle had taken no action that had had a high probability of killing Steele, (5) the jury *could* have convicted Konkle based on the eggshell-skull doctrine even though it did not believe that he had knowingly killed him. The mere possibility that the jury could have convicted Konkle on an arguably improper basis, however, falls far short of establishing that the prosecutor's comments constituted fundamental error. *See Nix v. State*, 158 N.E.3d 795, 801 (Ind. Ct. App. 2020) ("And, in any event, given that Nix's arguments are nothing more than speculation, he has not shown that a fair trial was impossible."), *trans. denied*.

[45] Most of this reasoning is based on conjecture. For example, there is no reason to think that the jury believed that Steele's true cause of death was a heart attack, as opposed to manual asphyxiation.[10] As for whether evidence that Konkle choked Steele is conflicting, this is, in fact, the case. Brittany Fry testified that she had seen Konkle with Steele in a "headlock[,]" Tr. Vol. III p. 132, and Walker testified that he had seen Konkle's arms around Steele's neck. While Christopher Gartrell indicated that he had also seen the fight but had not

---

[10] This strikes me as a flawed assumption, especially in light of (1) the jury's guilty verdict and (2) Dr. Nichols's admission that his conclusions had failed to take into account evidence that Konkle had had Steele in a chokehold. Dr. Nichols (who himself agreed that choking someone into unconsciousness can be fatal) went so far as to admit that his understanding of what had occurred during the fight may not have been accurate. (Tr. Vol. II p. 250). It seems to me that a much more reasonable assumption is that the jury did *not* credit Dr. Nichols's testimony regarding Steele's cause of death.

seen any chokehold, he also indicated that he was "close friends" with Konkle and that the two of them socialized "a lot," testimony the jury was entitled to consider in evaluating Gartrell's credibility. Tr. Vol. III p. 17. The mere fact of a conflict in evidence, however, is not proof that the jury was confused or uncertain about the subject of that evidence.

[46] The majority's disposition also relies on the likelihood that the jury listened to the prosecutor's explanation of the eggshell-skull doctrine and took that statement to heart while ignoring the trial court's instructions.[11] As mentioned, the trial court properly instructed the jury that it was required to at least find that Konkle had knowingly killed Steele in order to support a conviction of murder or voluntary manslaughter. "'When the jury is properly instructed, we will presume they followed such instructions.'" *Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015) (quoting *Duncanson v. State*, 509 N.E.2d 182, 186 (Ind.1987)). There is nothing in the record to rebut the presumption that the jury followed the trial court's proper instructions.

[47] It is vaguely possible that the jury disbelieved all of the evidence that Konkle had knowingly killed Steele and, while also disregarding the trial court's instructions, nonetheless convicted him on the basis of the eggshell-skull doctrine. Fundamental error, however, requires that a fair trial was rendered

---

[11] The trial court instructed the jury (1) that it could not convict Konkle of murder or voluntary manslaughter unless it found that he had knowingly or intentionally killed Steele, (2) regarding the statutory definition of "knowingly," (3) that the final arguments of counsel are not evidence, and (4) that its instructions were the best source of law.

impossible, not that an unfair trial was a vague possibility. In my view, this case falls far short of the very high standard for fundamental error. *See Nix*, 158 N.E.3d at 801.

## II. Sufficiency of the Evidence

[48] "When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict." *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We will neither assess witness credibility nor "weigh the evidence to determine whether it is sufficient to support a conviction." *Id*. When presented with conflicting evidence, we "must consider it most favorably to the trial court's ruling." *Id*. We will affirm the conviction "unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id*. "It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence." *Id.* "The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Id.*

[49] Konkle only challenges the jury's conclusion that the evidence sufficiently proves that he acted knowingly when he killed Steele. A person commits voluntary manslaughter when he knowingly or intentionally kills another human being while acting under sudden heat. Ind. Code § 35-42-1-3(a). The existence of sudden heat is a mitigating factor that reduces what would otherwise be murder to voluntary manslaughter. Ind. Code § 35-42-1-3(b). Again, a person engages in conduct knowingly if, when he engages in the conduct, he is aware of a high probability that he is doing so. Ind. Code § 35-

41-2-2(b). In other words, "[a] person knowingly kills when they are 'aware of a high probability' that their actions may kill." *Leonard v. State*, 80 N.E.3d 878, 882 (Ind. 2017) (quoting Ind. Code § 35-41-2-2(b)). The State was required to prove that Konkle was aware of the high probability that his actions—wrapping his arms around Steele's neck while laying on top of him—would result in Steele's death. "Because knowledge is the mental state of the actor, the trier of fact must resort to reasonable inferences of its existence." *Young v. State*, 761 N.E.2d 387, 389 (Ind. 2002).

[50] I have little hesitation concluding that the State produced sufficient evidence to sustain the jury's finding that Konkle had knowingly killed Steele. Konkle first attacked Clark, and, when he realized that he had attacked the wrong person, became even angrier and went looking for Steele. Konkle confronted, threatened, and antagonized Steele until Steele lashed out and punched Konkle. After an exchange of blows, Konkle wrapped his arms around Steele's neck and laid his body on top of Steele's. While holding Steele down, Konkle told him, "go to sleep, b[****.]" Tr. Vol. II pp. 246. Konkle held Steele in that position until he was gurgling, gasping for air, and foaming at the mouth.

[51] From this evidence, a jury could have reasonably inferred that Konkle had intended to cause Steele to pass out or make him unconscious. "It is generally presumed that a person intends the natural, necessary, and probable consequences of his or her acts." *Book v. State*, 880 N.E.2d 1240, 1252 (Ind. Ct. App. 2008), *trans. denied*. The natural and probable consequence of Konkle choking Steele into unconsciousness was that Steele would be deprived of

oxygen, which deprivation, if sufficiently prolonged, leads to death. Moreover, Konkle asked several carnival employees to lie and say that Steele had fallen while taking a shower. *See, e.g.*, *Stone v. State*, 555 N.E.2d 475, (Ind. 1990) (noting that attempts at concealing evidence may be considered by a jury as revealing consciousness of guilt). Finally, when paramedics and law enforcement arrived, Konkle attempted to flee. *See Myers v. State*, 27 N.E.3d 1069, 1077 (Ind. 2015) (noting that efforts to avoid arrest can be viewed as consciousness of guilt). The State produced evidence from which a jury could have reasonably concluded that Konkle knowingly killed Steele, which is sufficient evidence to sustain Konkle's conviction of voluntary manslaughter.

## III. Sentence

[52] We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied* (citations and quotation marks omitted). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind.

2008).  In addition to the "due consideration" we are required to give to the trial court's sentencing decision, "we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007).  Konkle was sentenced to an aggregate term of thirty-four years of incarceration out of a possible maximum of fifty years.

[53]   As to nature of his offense, Konkle killed Steele for his alleged ridicule of a special-needs child.  Konkle sought out Steele after being told by numerous other carnival employees and family to let management address the situation.  Instead, Konkle continued to seek out Steele over the course of a few hours and threatened him until a physical altercation ensued.  After the altercation, Konkle asked other carnival employees to lie about what had happened and when they refused, attempted to flee the scene.

[54]   Konkle's character also does not support a reduction of his sentence.  As a juvenile, Konkle was adjudicated a delinquent for domestic battery.  Konkle violated juvenile probation numerous times for failing drug screens and engaging in violent behavior with other family members.  As an adult, Konkle has been convicted of sexual misconduct with a minor, battery resulting in bodily injury, battery, and operating a vehicle without ever receiving a license. *See, e.g.*, *id.* at 874 (concluding that the number of prior offenses in relation to the current offense is significant in assessing the defendant's character).  Konkle has also repeatedly violated the terms of probation and has had probation revoked.  Konkle's repeated and consistent disregard for the law does not cast

his character in "a positive light," which is his burden to show under Rule 7(B). *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Konkle has failed to demonstrate that his sentence is inappropriate in light of the nature of his offense or his character.

[55] Because I would vote to affirm the judgment of the trial court, I respectfully dissent.